(No. 48830.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ARDICE HEFLIN, Appellant.

*Opinion filed May 26, 1978.*

526

528

KLUCZYNSKI, J., took no part.

Ralph Ruebner and Mary Robinson, Deputy Defenders, and Joshua Sachs and Michael Mulder, Assistant Defenders, of Elgin, for appellant.

William J. Scott, Attorney General, of Springfield (Donald B. Mackay and Joan Bainbridge Safford, Assistant

Attorneys General, of Chicago), for the People.

MR. JUSTICE RYAN delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Ardice Heflin, was found guilty of murder and conspiracy to commit murder. The court entered judgment on the murder conviction and sentenced the defendant to a term of 30 to 60 years' imprisonment. The appellate court affirmed (40 Ill. App. 3d 635), and we granted defendant's petition for leave to appeal (58 Ill. 2d R. 315).

The charges against the defendant resulted from the death of Clifford Atkinson, who was shot and killed in his home on January 3, 1974. Atkinson's widow, Karolyn, who was indicted on the same charges as the defendant, was found not guilty in a jury trial held subsequent to that of defendant's.

The defendant and Karolyn Atkinson were involved in a love affair which began on September 21, 1973. From that date until the end of October, the two saw each other frequently, many of the meetings taking place at the Atkinson home while Clifford Atkinson was at work. At times, however, the defendant would be in the home while Atkinson was there. When necessary, he would hide in the basement or attic storage area, from which point he often observed Atkinson at work in his yard.

Much of the incriminating evidence proffered by the State against the defendant consists of letters which were written between Karolyn Atkinson and the defendant. Thirty-six such letters were introduced into evidence—24 from Karolyn and 12 from the defendant. Generally, the letters written by both Karolyn and the defendant indicated that the couple planned to be married and live in the house that was being built by Clifford Atkinson. Several of the letters indicated the existence of a sinister

design, and are discussed in detail below.

The events surrounding the shooting of Clifford Atkinson were reconstructed at the trial by the defendant, who testified on his own behalf, and Officer Philip Stevenson of the Waukegan police department, who was called on by the defense to testify to what Karolyn had told him following the shooting. Karolyn refused to testify on the grounds that her testimony might tend to incriminate her. The stories are generally consistent, although they differ with respect to some of the details, as noted below.

On January 3, 1974, defendant was met at the airport by Karolyn and her two-year-old daughter. Karolyn drove the defendant back to her house, where the two made love and spent the afternoon together. The defendant removed a hunting knife from a cabinet and told Karolyn that he was going to take it back to Michigan with him. On another occasion he had taken four knives and a gun from the cabinet with Karolyn's permission.

At 4:15 p.m. Karolyn left the house to pick up her husband at work, leaving the defendant in the house. According to Officer Stevenson's testimony, Karolyn thought that the defendant had left the house when she and her husband returned at 9:15, after spending several hours at the site of their new home. Defendant, however, testified that he hid in the basement in order to see Karolyn later that night while her husband would be out of the house at a doctor's appointment.

Defendant fell asleep in the basement. When he awoke, it was dark outside. He became alarmed and decided to leave. The cellar exit leading from the basement was blocked, so he decided to go directly through the house. He ran into something as he moved to the stairs. This aroused Atkinson's attention, who came to the head of the stairs and confronted the defendant as he stood on the first landing. Atkinson jumped on top of the defendant

and pushed him down the stairs. As he fell, the defendant grabbed Atkinson and the two men fell together onto the basement floor.

The defendant testified that Atkinson yelled to Karolyn to bring a gun. Officer Stevenson testified that Karolyn had told him that she grabbed her husband's .22-caliber rifle and ran downstairs because she had heard noises in the basement. In any event, Karolyn rushed down into the basement and saw the two men wrestling on the floor. Her husband yelled at her to shoot the defendant. Karolyn, instead, fired a shot that hit her husband in the hip. Atkinson screamed to Karolyn, "You shot me, damn it, shoot him." However, as the two continued to struggle, Karolyn shot her husband a second time. The fighting continued for five or ten seconds, then Atkinson became still. Defendant pushed Atkinson away, ran to the top of the stairs, and collapsed.

The defendant testified that shortly thereafter he returned to the basement, found that Atkinson was dead, picked up the rifle and went back up the stairs. According to the defendant, he dismantled the rifle and attempted to wipe any fingerprints from it. Officer Stevenson testified that Karolyn had taken the gun upstairs immediately after the shooting, dismantled it, and placed it in a closet after attempting to wipe off her fingerprints. At the trial, a fingerprint expert testified that the only identifiable print impressions on the gun were those of the defendant.

The defendant went down to the basement a second time to get his briefcase, wearing a pair of kitchen gloves to avoid leaving any more prints downstairs. He put the knife and rifle clip in his briefcase. The next day he put his briefcase in a locker at a train station in Waukegan.

Shortly after midnight on the same evening, the police responded to a report of a burglary in progress at the Atkinson home. When they arrived, Atkinson was dead in the basement. There were large, deep cuts on his hands,

and scratches on his skin. Karolyn told the police that a tall Negro wearing dark clothes and yellowish-orange gloves had burglarized the home, and that her husband trapped him in the basement. She further told the police that her husband had brought a gun into the basement when he went after the burglar. The police became suspicious about the story when they could find no footprints in the snow leading to or from the cellar entrance. Despite the lack of footprints, there were handprints in the snow that had accumulated on the outside of the cellar door, apparently made to give the impression that someone had used that entrance during the evening. Eventually Karolyn admitted to the police that the story about the black burglar was untrue, and that the defendant was involved in her husband's death. During his testimony, the defendant claimed that he and Karolyn were forced to concoct the story of the black burglar, because no one would believe what actually happened. He admitted that he had made the handprints on the outside of the cellar door, but that he had forgotten to make any footprints in the snow leading to or from the entrance.

The first question is whether the State presented sufficient evidence to permit the jury to find the defendant guilty of murder beyond a reasonable doubt. For reasons discussed below, we agree with the appellate court that enough credible evidence was presented to support the finding of the jury of guilty of murder.

Defendant relies heavily on the cases from this State that hold that where the only evidence in a prosecution for homicide is circumstantial, the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. (See *People v. Willson* (1948), 401 Ill. 68; *People v. Campagna* (1909), 240 Ill. 378.) The defendant argues that the facts as presented do not exclude the reasonable hypothesis that Mrs. Atkinson shot her husband without his aid or connivance when she saw

him involved in a struggle with her lover, and therefore he contends he cannot be held accountable for Atkinson's death.

To support his arguments that he did not aid or abet Karolyn Atkinson in the shooting of her husband, defendant presented evidence consistent with his claim that he had intended to break up with Karolyn on the 3rd of January and eventually move back to Michigan. In this regard, one of the girls whom the defendant had said he was dating testified that defendant called her from Michigan and told her he was leaving on January 3 to fly to Chicago and made dates with her for January 4 and 5. Also, Tim Nichols, defendant's cousin, testified that defendant told him in December that he had plans of establishing a permanent residence in Michigan and of breaking up with Karolyn. Nichols also corroborated the defendant's testimony that the defendant had made arrangements to buy a trailer in Michigan in December and had made a down payment. According to the defendant, he was going to move into the trailer some time after the first of the year. Defendant contends that this evidence satisfactorily refutes the theory presented by the State that he and Karolyn plotted to kill Clifford Atkinson, get married, and live in the house that Atkinson was building at the time of his death.

The State presented evidence at trial to support alternative theories of guilt. First, the State contended that defendant was the person who killed Clifford Atkinson. Alternatively, the State argued that Karolyn Atkinson shot her husband, but that defendant aided and abetted her and is therefore accountable for Atkinson's murder (Ill. Rev. Stat. 1973, ch. 38, par. 5—2). Regarding the State's first theory of the case, we point out that the jury was not compelled to accept the defendant's account of what happened at the time of the crime, but was permitted to consider the surrounding circumstances and the probabil-

ity or improbability of the defendant's story. (*People v. Wiggins* (1957), 12 Ill. 2d 418.) However, even accepting for the moment the account of Atkinson's death as supported by the testimony adduced at trial, that is, that Karolyn Atkinson fired the fatal shots, we are convinced that there was sufficient credible evidence from which the jury could find the defendant guilty of murder by accountability.

The Criminal Code of 1961 provides that:

> "A person is legally accountable for the conduct of another when:
>
> \* \* \*
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. \*\*\*" (Ill. Rev. Stat. 1973, ch. 38, par. 5—2(c).)

Pursuant to the underlying intent of this statute, if the circumstances show that there is a common design to do an unlawful act to which all assent, the act of one is the act of all. (See *People v. McClindon* (1973), 54 Ill. 2d 546; *People v. Washington* (1962), 26 Ill. 2d 207.) Here, the evidence supports a finding of guilt beyond a reasonable doubt that the defendant took part in a common felonious plan to cause the death of Clifford Atkinson. Further, we think this evidence, even though circumstantial, was convincing enough to allow the jury to reasonably exclude the hypothesis of innocence presented by the defendant, *i.e.,* that Karolyn Atkinson shot her husband without his aid or connivance.

The letters that were introduced into evidence show that the couple was involved in a heated love affair. Both the defendant and Karolyn Atkinson made constant reference to their spending their lives together. Karolyn often expressed excitement over the future marriage, and often wrote about their living in the house that Atkinson

was building. However, no letter written by Karolyn after October ever mentioned divorce, nor was any evidence presented that a divorce proceeding had been filed as of January 3, 1974. And, while during the trial the defendant repeatedly disclaimed any intention of marrying Karolyn, and testified that he had planned to break up with her on January 3, 1974, his letters clearly show a contrary intent. He admitted he had never told Karolyn that he intended to break up with her or that he intended to leave the State.

This illicit scenario takes on a sinister design when examined against the backdrop of several of the incriminating letters admitted into evidence. Thus, defendant wrote to Karolyn:

> "Baby I want you for myself. Myself do you hear?
> No one else is to share your love *** I love you so much.
> Life is so great without your husband I think I will retiree
> [*sic*] him permanently."

It was not unreasonable for the jury to infer that the defendant was referring to Atkinson's physical demise in this letter, and not to Atkinson's sexual retirement, as the defendant claimed during his testimony. Not only was this inference a reasonable deduction in light of the ensuing events, but defendant had told several members of his family, as early as October, that Atkinson had been killed in an industrial accident.

The letters written by Karolyn further support inferences as to the sinister nature of their common plan. In a letter written from Karolyn to defendant on November 19, several weeks after defendant had moved to Michigan to find work, Karolyn wrote that she hoped some day to be able to celebrate years instead of months, that she was looking at the 1974 calendar to see when the 21st (the day of the month on which defendant and she had met) falls on a Saturday, and that the first time was September 21. She stated in the letter that September 21 was "a long way from January but it is a very good date. I don't know how

long I'm expected to stay in morning [*sic*]. I'd hate to wait all the way to September." It is not unreasonable to conclude that "stay[ing] in morning" referred to her husband, and not to the defendant's mother, as the defendant argued. Indeed, we think it rather unreasonable to believe that Karolyn would write to the defendant and express reluctance over having to stay in mourning for his own mother. Moreover, while defendant testified that his mother was suffering from terminal cancer, and introduced several letters, written to Karolyn, in which he discussed his mother's terminal illness, she was still alive at the time of the trial.

Also, on November 26, 1973, Karolyn wrote to the defendant and expressed a desire to "hurry [their] plans." In another letter, which is undated, she wrote that "There's only 8 more days left. I can hardly wait. Then we have a wait of 49 days until we can be secretely [*sic*] married in Mich. ***." In another letter she wrote, "Only 5 days to go and then only 49 from then but 57 from today."

There is strong evidence that the letter in which Karolyn wrote that "There's only 8 more days left" was written 8 days before January 3, 1974. Forty-nine days from the 3rd of January would have fallen on the 21st of the month, the day of the month to which Karolyn constantly referred as the day on which she wanted to be married. Defendant claims that Karolyn's excitement over the 3rd of January, both in this letter and the letter apparently written 5 days before the 3rd, was in anticipation of the couple's celebration of New Year's and Christmas, which they had planned to take place on that date. However, the importance of the 3rd, as signified by these letters, was clearly that it had some relation to the date in the future when the couple would be free to be married. In this regard the jury could reasonably consider the fact that Karolyn had not discussed divorce in any

letter written during this period, nor was there any evidence that she had made plans to file for a divorce in the near future.

The defendant argues that he had made plans to break up with Karolyn on the 3rd, and to move back to Michigan shortly thereafter. However, his arguments in support of this hypothesis are not very convincing. He was with Karolyn the entire day of the 3rd and by his own testimony never mentioned the breakup to her. And, he admitted that he would have had to ask her to drive him back to the airport and would have had to borrow money from her before he left. Furthermore, after the defendant's capture, he professed his great love for Karolyn and lied to the police to protect her. This array of facts is not consistent with his story that he had planned to break up with Karolyn Atkinson on January 3 and never see her again.

In addition, the jury could consider that the defendant was aware of a $30,000 decreasing-term policy insuring Atkinson's life in connection with the mortgage on the new house he was building and also that in the month period preceding the 3rd of January 1974 the couple communicated on practically a daily basis by long-distance telephone.

On the basis of all the above evidence, we conclude that the verdict finding the defendant guilty beyond a reasonable doubt should not be disturbed. The jury heard the evidence offered in rebuttal by the defendant and observed the demeanor of the witnesses and judged their credibility. In our view, the evidence itself, and the inferences and deductions which the jury regarded as reasonably flowing therefrom, sufficiently nullify the hypothesis proferred by the defendant that Karolyn Atkinson shot her husband without defendant's aid or connivance. This perhaps is a potential explanation, but in light of the evidence, the jury was not required to believe

that it is a reasonable one. See *People v. Russell* (1959), 17 Ill. 2d 328.

The defendant argues that the trial court erred in denying his motion to suppress the letters written between himself and Karolyn Atkinson. We have at least implicitly addressed this argument by considering the letters as evidence in support of the jury verdict of guilty beyond a reasonable doubt. However, since our finding that the trial court properly denied the defendant's motion to suppress raises several important constitutional issues, we will devote some discussion to this aspect of the case.

Jon Heflin, the defendant's brother, drove to the Waukegan police department on the night of January 7, 1974, from his home in West Bloomfield, Michigan. At the police station, the police informed him of his brother's arrest. One of the police officers inquired about correspondence between defendant and Karolyn Atkinson and asked if Jon would get the letters for the police. Shortly thereafter, Jon spoke to the defendant, who asked him to pick up his car at the airport in Detroit and to collect his personal belongings and take them to Jon's house for storage. Jon did not mention the letters or the police request for them to the defendant.

Jon spoke to defendant's counsel on the same evening. Jon informed him of the police request for letters. According to the defense counsel's testimony, he told Jon that he did not have to turn over the letters to the police, but he admitted that he did not instruct Jon not to do so. The attorney also expressed his desire to see the letters.

Upon returning to Michigan, Jon collected the defendant's belongings from the defendant's car, which Jon had picked up from the airport, and from his home, where the defendant had stayed from October 1973 to some time in November 1973. He also gathered the defendant's belongings from the home of his cousin Tim Nichols, where the defendant had lived from November 1973 until the time of

his arrest.

On January 11, 1974, Jon received a call from one of the police officers in Waukegan who asked Jon to send the letters as soon as possible. Jon gathered all the letters, which he had collected from his home, from the defendant's car and from the defendant's room at the Nichols residence, and mailed them to the police. He sent one group of letters to the police on January 14, 1974, and a second group on January 18, 1974.

No search warrant was issued authorizing the seizure of the letters. The defendant argues that the seizure of the letters was unreasonable, since it was accomplished without a warrant by persons acting at the request of the police.

The constitutional proscription against unreasonable searches and seizures does not apply to searches or seizures conducted by private individuals. (*Burdeau v. McDowell* (1921), 256 U.S. 465, 65 L. Ed. 1048, 41 S. Ct. 574.) The validity of the defendant's argument that there has been an unreasonable search and seizure in this case, consequently, rests on the presumption that Jon Heflin acted as an agent or instrumentality of the State in turning over the correspondence of his brother to the Waukegan police.

The relevant factors involved in determining whether or not a particular search should be attributed to the government have been frequently discussed by the Supreme Court of the United States. (See, *e.g.*, *Lustig v. United States* (1949), 338 U.S. 74, 93 L. Ed. 1819, 69 S. Ct. 1372.) Where a search is conducted by a private individual, the search will be subject to constitutional guarantees when the individual conducting the search can be regarded as acting as an agent or instrument of the State "in light of all the circumstances of the case." (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 487, 29 L. Ed. 2d 564, 595, 91 S. Ct. 2022, 2049.) Participation by the police in and of itself, then, does not automatically invoke

the application of the guarantees against unreasonable government intrusions safeguarded by the fourth and fourteenth amendments. In *Coolidge v. New Hampshire,* in response to a query by the police whether her husband had any guns at home, Mrs. Coolidge, defendant's wife, took four guns out of a bedroom closet and handed them to the officers. She also produced for the police the clothing that the defendant had worn on a particular night. The Supreme Court upheld the warrantless search and seizure on the grounds that it was not a government search, but rather was conducted by a private individual not acting as a State agent or instrument.

In upholding the seizure of defendant's possessions, the Supreme Court noted there was no unreasonable police conduct that had coerced Mrs. Coolidge into becoming an unwilling assistant in the search for evidence. In fact, the Supreme Court specifically referred to the absence of "the more subtle techniques of suggestion that are available to officials in circumstances like these" (403 U.S. 443, 489, 29 L. Ed. 2d 584, 596, 91 S. Ct. 2022, 2050). Consequently, the fact that the search may have been prompted by the police inquiry was not critical; rather, the court placed emphasis on the nature of the police involvement and the independent decision of Mrs. Coolidge to turn over her husband's possessions to the police.

The defendant argues that the present situation is different from that in *Coolidge,* because here there were specific requests for his possessions. We do not think this factor is dispositive. Here, as in *Coolidge,* we can find no evidence of unreasonable police conduct or coercive influence over the private individual who turned the defendant's possessions over to the police. Considering the entirety of the evidence, we think it sound to conclude that Jon Heflin decided to voluntarily turn the letters over to the police without their persuasion. The letters were obtained by Jon Heflin at the insistence of the defendant,

not the police, and Jon Heflin discussed the letters with the defendant's attorney, who gave him no specific orders not to turn them over. Moreover, the nature of the initial request and the follow-up requests by the police indicate that no pressure, subtle or otherwise, was exerted on Jon Heflin at any time. Consequently, we conclude that Jon Heflin acted independently and that the search and seizure of defendant's possessions was without the requisite degree of police involvement necessary to invoke constitutional guarantees.

Assuming *arguendo* that a government search and seizure was involved in this case, we think the record sufficiently supports a finding that it was conducted with the voluntary consent of one having joint access and control over the articles seized. This is significant, because "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993; *People v. Stacey* (1974), 58 Ill. 2d 83, 87-88.) Moreover, when one with common authority consents to the search and seizure, the search will not be invalidated because the defendant claims an "expectation of privacy" in the premises or effects subjected to the search. *People v. Stacey* (1974), 58 Ill. 2d 83, 89.

In the instant case, it is clear that Jon Heflin had common authority over the letters gathered from his own home. According to the record, the defendant's letters were found in closets shared with family members, on bookshelves, in drawers, on the top of the refrigerator, and in the family recreation room.

Jon also turned over the letters which he obtained

from the defendant's room at his cousin's house and from the defendant's car. As we have indicated, Jon obtained possession of his brother's car and the belongings at the Nichols home at the request of the defendant and with the knowledge and consent of the defendant's attorney. There were no instructions either from the defendant or from the attorney forbidding others to have access to the letters. Accordingly, we think it proper to conclude that there was "common authority" over the letters as the term is defined in *United States v. Matlock*. As to these letters, as with the letters taken from the Jon Heflin home, there was "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (*United States v. Matlock* (1974), 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7.) Accordingly, the trial court correctly denied the defendant's motion to suppress the letters from admission into evidence.

The defendant argues that he was denied a fair trial because the jury was subjected to improper closing arguments concerning the law of accountability. Further, the defendant argues that error was compounded by the court's refusal to answer the jury's question whether "the intent to promote or facilitate was a necessary condition" to holding a person accountable for murder. The defendant contends that the combination of these errors served to deprive him of his constitutional right to have every element of the crime with which he was charged, including the critical element of intent to promote or facilitate the substantive offense, proved beyond a reasonable doubt.

During his closing argument, the attorney for the People argued that even if the jury found Mrs. Atkinson pulled the trigger, the defendant was guilty of murder

because he applied psychological pressure on her, causing her to shoot her husband. This argument was clearly improper and misleading because it did not adequately state the law—the psychological pressure of defendant upon Karolyn Atkinson would not support a guilty verdict by accountability unless the defendant, with the intent to commit murder, aided and abetted Karolyn Atkinson. (Ill. Rev. Stat. 1973, ch. 38, par. 5—2.) The defense counsel, consequently, objected to the argument as improperly stating the law concerning accountability. The trial judge correctly sustained the objection, and specifically directed the jury to "disregard the fact [of psychological pressure] unless [the defendant] was aiding and abetting her to kill."

In light of the judge's admonition to the jury to disregard the improper argument, we deem the error inconsequential. As we explain below, we do not agree with the defendant that the error was prejudicial when compounded with the judge's later refusal to clarify the jury's apparent confusion concerning the elements necessary to hold an accused guilty by reason of accountability.

During the jury's deliberations, the trial court received the following written request from the jury: "Will you please rephrase the definition of legal responsibility. We are in disagreement concerning intent to promote or facilitate is [sic] a necessary condition."

The term "legal responsibility" appeared in two important instructions from the trial court. First, the trial court had instructed the jury that:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of the crime." Modified Illinois Pattern Jury Instruction, Criminal, No. 5.03.

Also, in a modified Illinois Pattern Jury Instruction on murder, the trial court had instructed the jury as follows:

"First: That the defendant, or a person for whose conduct the defendant is legally responsible, performed the acts which caused the death of Clifford Atkinson;

Second: That when the defendant, or a person for whose conduct the defendant is legally responsible, did so, he or a person for whose conduct he is legally responsible, intended to kill or do great bodily harm to Clifford Atkinson, or he or a person for whose conduct he is legally responsible, knew that his acts would cause death or great bodily harm to Clifford Atkinson, or he or a person for whose conduct he is legally responsible, knew that his acts created a strong probability of death or great bodily harm to Clifford Atkinson." Modified IPI Criminal No. 7.02.

Initially, defendant's counsel had objected to the word "responsible" in the instruction concerning legal accountability. He pointed out to the court that the word "responsible" was a common term and could be interpreted by the jury in a number of ways. The court considered this argument and asked the prosecutor whether he would object to replacing the term "responsible" with "legally accountable." The prosecutor stated that he would object, because this would serve to make the accountability instruction ostensibly inconsistent with the murder instruction, which used the word "responsible." The court compromised and used the words "legally responsible" in both instructions. As a result, the jury would be prevented from interpreting "responsible" in the manner feared by defendant's counsel, and, in turn, the prosecutor's request that the instructions remain as consistent as possible was satisfied.

Clearly, the trial judge was quite concerned with providing the jurors with fair and accurate instructions, as indicated by the judicious manner in which he tried to minimize any potential confusion which might arise among

the jurors with respect to accountability. We think he satisfactorily achieved his purpose of properly instructing the jury and that he was squarely within the bounds of his discretion to refuse to answer the question put to him by the jurors. The instructions were compiled only after considerable discussion and debate between the trial judge and counsel over pertinent points. They clearly provide that the "intent to promote or facilitate" is a prerequisite to a finding of "legal responsibility." Because they are unambiguous on this point, we agree with the trial judge that the question by the jury called for little more than for him to "help [the jury's] understanding of the English language." We point out that the judge did not arbitrarily or perfunctorily refuse to answer the question. His decision was made only after a lengthy discussion with defendant's counsel and the prosecutor, and that he ultimately decided against answering the question because he felt that it would unnecessarily emphasize one segment of the instructions. Based on this evidence, we cannot say that the trial court abused its discretion by not answering the jury's question.

The defendant argues that his sentence of 30 to 60 years for the murder of Clifford Atkinson is excessive and should be reduced. We do not agree.

This court will not disturb a sentence imposed by the trial court unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose. (*People v. Taylor* (1965), 33 Ill. 2d 417.) In this State, the spirit and purpose of the law are upheld when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant. See Ill. Const. 1970, art. I, sec. 11.

In our opinion, the trial court's sentence should not be disturbed. The record shows that the trial judge carefully weighed all of the factors in the presentence

report in favor of a minimum sentence against the heinous nature of the crime and the circumstances under which it was committed. He also considered the rehabilitative potential of the defendant. In light of all these factors, and the trial court's consideration thereof, we cannot say that the 30- to 60-year sentence is excessive or unauthorized by law.

*Judgment affirmed.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.