STATE of Iowa, Appellant,

v.

Paul Cleveland CAMPBELL, Appellee.

No. 67718.

Supreme Court of Iowa.

Nov. 24, 1982.

Thomas J. Miller, Atty. Gen., John P. Messina, Asst. Atty. Gen., and Channing Dutton and James Smith, Asst. County Attys., for appellant.

John C. Wellman, Defender Advocate, Des Moines, and F. Lee Bailey, Boston, Mass., for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, LARSON, SCHULTZ, and CARTER, JJ.

CARTER, Justice.

This appeal by the State on discretionary review seeks to overturn two pretrial rulings of the district court relating to the admissibility of the evidence in a pending criminal case. The defendant, Paul Cleveland Campbell, is charged with murder in the first degree by trial information filed August 12, 1981. That information charges that defendant murdered Sherri Henderson on or about July 2, 1981. The pretrial evidentiary rulings of the district court for which the State has sought appellate review are: (1) an order sustaining defendant's motion to suppress evidence obtained by police officers at the residence of Cathy Campbell, the sister of defendant, where defendant also resided, and (2) an order sustaining defendant's motion in limine which challenged the admissibility of certain footprint identification testimony and accompanying demonstrative evidence. We consider these two rulings separately. Those facts which are necessary to the resolution of the legal issues presented are set forth in our discussion of the applicable points of law.

I. *Admissibility of Clothing Obtained at Cathy Campbell's Residence.*

The record reflects that police officers investigating the Sherri Henderson murder surmised that blood might be found on the clothing of her assailant. Defendant was a suspect in the killing, and police learned that he resided with his sister, Cathy Campbell, at 924 East 17th Street in Des Moines. Early on the morning of July 3, 1981, the day after the murder was allegedly committed, Sergeant Fitzgerald, Sergeant Weatherington, and Officer Rowley of the Des Moines Police Department went to the home of Cathy Campbell to speak with her about her brother. The officers knocked at the door and were greeted by Cathy Campbell. She admitted the officers to her home and engaged in conversation with Sergeant Fitzgerald. This conversation was later joined by Joann Johnson, defendant's girlfriend, who had emerged from a bedroom of the residence.

At the outset of this conversation, Cathy Campbell was advised that the police had a warrant for her brother for a parole violation. Sergeant Fitzgerald asked if defendant were living at her house, and she replied that he was. The discussion then turned to what clothing defendant had worn on the morning of July 2, 1981, the alleged murder date. Cathy Campbell indicated that when she saw her brother on that morning he was wearing tennis shoes and blue jeans with diamonds on the rear pockets. At this point, there is a conflict in the testimony as to what transpired.

According to Sergeant Fitzgerald, he then asked Cathy Campbell if she knew where the clothing was located at which time Joann Johnson left the room and returned with a v-necked shirt and a pair of blue jeans which matched the description previously given to the officers. She handed these items to Officer Rowley. According to the testimony of Cathy Campbell at the suppression hearing, the clothes were produced by Joann Johnson only after the police had asked her to do so. Evidence was offered at the suppression hearing that Officer Rowley had stated in a prior deposition that the clothes in question were obtained upon police request. Joann Johnson indicated in her testimony at the suppression hearing that she did not remember whether the police had asked that the clothing be produced. After the officers viewed this clothing and discovered the presence of blood, they retained it in their possession. They then informed Cathy Campbell that her brother was a suspect in a murder. Thereafter Cathy Campbell executed a written consent for search of the premises.

Cathy Campbell also testified at the suppression hearing as to the circumstances under which defendant came to live in the home which she was renting. She testified that less than one month prior to the evening the officers were at her home she received a call from defendant from a Des Moines bus station. Her relationship with defendant had not been close and she had not seen him for some time. She believed that he had been living out of the state.

When she picked defendant up at the bus station she was informed that he had recently been released from prison in another state and needed a place to live. Some consideration was then given to defendant's residing with his mother, but it was determined that she did not have sufficient room. It was then agreed that defendant could be given one of the two bedrooms in Cathy Campbell's house in which to reside. Cathy Campbell testified that she made an arrangement with defendant that he would perform yard work and clean and maintain his own room in exchange for the use of same. In response to a question concerning her access to the room for any reason the following question was asked.

Q. Did you ever have occasion, as a part of the living arrangement that you had with your brother, to clean his room, go in and vacuum or pick up items of clothing that needed to be washed?

A. No, because he would put his stuff down the basement. I really didn't go into Paul's room for pretty very much of anything.

This was the record upon which the trial court determined defendant's motion to suppress any use of the clothing which officers received at Cathy Campbell's residence as evidence at his trial. This motion to suppress alleged that the clothing had been obtained by means of a warrantless search which had not been consented to by the defendant. The trial court found that it appeared from the most credible testimony at the suppression hearing that the clothing in question had been produced upon the request of the police officers that this be done. It concluded that the living arrangement between defendant and his sister was such that the latter did not have authority to consent to a search of defendant's bedroom. Based upon these findings and conclusions, the motion to suppress was sustained.

At the outset of the State's argument, it is claimed that this is not a consent search case. The State seeks to characterize what happened with respect to defendant's cloth-

ing as "a voluntary turnover by a private party." For reasons which become apparent from the discussion which follows, we believe the present case requires consideration of the principles involved in both the "private party turnover" cases and the consent search cases.

■ In considering the alleged violation of constitutional safeguards, we are obliged to make an independent evaluation of the totality of the circumstances shown by the entire record. *Hall v. State,* 752 N.W.2d 325 (Iowa 1982). We have recognized that ordinarily the fourth amendment proscription against unreasonable searches and seizures does not apply to searches and seizures conducted by private individuals. *State v. Holliday,* 169 N.W.2d 768, 771–72 (Iowa 1969). This principle was long ago recognized in a fourth amendment interpretation by the Supreme Court in *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Government involvement in a search physically conducted by a private party can, however, take the private party's conduct outside the private search rule of *Burdeau. See, e.g., United States v. Payne,* 429 F.2d 169, 171 (9th Cir.1970); *Corngold v. United States,* 367 F.2d 1, 5–6 (9th Cir.1966).

We have also had occasion to consider circumstances where permission to conduct a search has been given by third parties. These cases involve issues of (1) whether consent was in fact given by a third party, *State v. Ahern,* 227 N.W.2d 164, 167–68 (Iowa 1975); and (2) who has authority to consent, *State v. Bakker,* 262 N.W.2d 538, 546–47 (Iowa 1978). With respect to the latter issue it has been held that when the prosecution seeks to justify a warrantless search by proof of voluntary consent "it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50 (1974).

■ It was the view of the trial court, mirrored in the arguments of defendant on this appeal, that the act of the police officers in requesting to see the defendant's clothing rendered the resulting turnover of evidence the product of government involvement. As such, it was found by the trial court to be a fourth amendment violation. This conclusion of the trial court was buttressed by its additional finding that Cathy Campbell did not have authority to consent to a police search of defendant's room. On the facts of the present case, we believe that the issue of authority to consent to a search has a direct bearing on the existence of a fourth amendment violation. If Cathy Campbell had authority to authorize a police search of defendant's room outside of the fourth amendment, then her tacit acceptance of Joann Johnson's cooperation with the police in securing the clothing was also a transaction not precluded by the fourth amendment. The production of the clothing under such circumstances may be viewed as part of a consent search by Joann Johnson in aid of the police. Given the atmosphere of cooperation which the record shows existed among Cathy Campbell, Joann Johnson, and the officers, before, during and after the production of the clothing, we determine on our de novo review that consent to such a search was freely given.

■ The critical issue remaining is whether the record establishes that Cathy Campbell had authority to permit a search of defendant's room by the police or by Joann Johnson in aid of the police. We conclude that it does. Critical in our findings on this issue is the showing that Cathy Campbell had not enjoyed a close relationship with defendant, had taken him in partly of necessity, and had been apprised that he had only recently been released from prison. As holder of the lease-hold interest in the subject premises, Cathy Campbell would have dominion over the entire household except as she voluntarily relinquished it in favor of the defendant. Defendant's right to privacy under such circumstances must be viewed not in light of what he would wish to have but rather in terms of

what his sister would wish to give. We find nothing in the record which suggests that Cathy Campbell relinquished her dominion over her household so as to preclude her authorization of the acts which took place in the present case. Evidence of her infrequent entry of defendant's room was tied to lack of reason for being there rather than lack of authority. The evidence as a whole satisfies the test of *Matlock* that she possessed "common authority over or other sufficient relationship to the premises" in order to consent to the search thereof.

In *People v. Heflin,* 71 Ill.2d 525, 539–41, 17 Ill.Dec. 786, 793–94, 376 N.E.2d 1367, 1373–74 (1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41 (1979), it was held that a police request for production of evidence by a defendant's brother did not render their subsequent production a fourth amendment violation. Just as we have done in the present case, the court in *Heflin,* coupled its "private party turnover" analysis with a finding of voluntary consent by one having control over the premises. While the court in *Heflin* found a third party dominion in the articles seized, as well as the premises searched, we believe that the seizure in the present case was authorized once the police, who were at a location where they were authorized to be, determined the evidentiary nature of the clothing. We find the trial court erred in ordering the suppression of the evidence obtained at the Cathy Campbell residence. We reverse said order and remand on that issue for further proceedings.

## II. *Admissibility of Footprint Identification Testimony.*

We next consider the State's claim that the trial court erred in sustaining defendant's motion in limine with respect to the admissibility of footprint identification testimony. The minutes of testimony reveal that the State intends to call criminalist Bruce Scott, an agent of the Division of Criminal Investigation, to testify as to certain footprint identification evidence. Defendant filed a motion in limine seeking to exclude this testimony on the sole ground

that "the witness cannot identify any unique or specific characteristics of the footprints, other than those possessed by a product of general distribution." The trial court sustained the motion on the ground that the proffered testimony of Bruce Scott did not sufficiently eliminate the possibility that the footprints in question might have been made by other shoes of the same brand.

In *State v. Mark,* 286 N.W.2d 396, 409 (Iowa 1979), we set out the principles concerning the admissibility of footprints or shoe prints in trying to connect a defendant with the crime charged:

> In order to establish a proper foundational connection between defendant and the crime scene shoe prints, it was necessary that the State establish that similarities existed between the distinctive characteristics exhibited by defendant and the characteristics exhibited by the maker of the crime scene shoe prints. (Citations). While an absolute or positive identification is not required, there must be a sufficient number of similar identifying characteristics to afford a basis for a reliable comparison. (Citations). Once the evidence is properly admitted, the weight to be given such evidence is for the jury to determine. (Citation).

In *State v. Burch,* 195 Iowa 427, 435, 192 N.W. 287, 290 (1923), this court said:

> Likewise, a witness who has measured the tracks and compared his measurements with the shoes of accused, may testify to the results, and that a correspondence exists in size and shape. . . .

See also *State v. Sigman,* 220 Iowa 146, 261 N.W. 538 (1935); *State v. Norman,* 135 Iowa 483, 113 N.W. 340 (1907).

In the record made at the hearing on defendant's motion, Bruce Scott testified that the following similarities exist between footprints found at the scene where the victim's body was located and the shoes of the defendant: (1) a similar herringbone tread pattern, (2) a similar size of the sole, and (3) a similar amount of wear exhibited by each. This witness also testified as to similarities (1) and (2) above with respect to the sole pattern of defendant's shoes and certain markings found on the victim's body.

■ While we believe our decision in *Mark* strongly suggests that it would not be an abuse of discretion to admit the testimony of this witness and accompanying demonstrative exhibits, we cannot accept the State's contention that the trial court's order on the motion in limine should be reversed at this point. The trial court has yet made no final ruling on the admissibility of the challenged evidence. In granting the motion in limine, it only ordered that:

> the state is prohibited on voir dire and in opening statement from disclosing to the jury the stipulated evidence and the opinion testimony of Bruce Scott and that such evidence should be offered at the appropriate stage of the trial in order that the court might judge its admissibility after having an opportunity to evaluate the total picture with regard to other circumstantial evidence that might possibly connect the defendant with the alleged crime.

We believe that the trial court was entitled to await the actual state of the record at the time the proffered testimony and demonstrative exhibits were offered at trial before finally resolving the issue of admissibility. This is particularly true because the requirements for admissibility of footprint identification testimony have been held to be less stringent where there is other evidence connecting the defendant with the crime scene. *United States v. Buck,* 449 F.2d 262, 276 (10th Cir.1976). *McClard v. United States,* 386 F.2d 495, 500 (8th Cir. 1967), *cert. denied,* 393 U.S. 866, 89 S.Ct. 149, 21 L.Ed.2d 134 (1968); *Downey v. United States,* 263 F.2d 552 (10th Cir.1959). In the present case the State had assured the court that such other evidence would be produced at trial, a circumstance which supports the court's decision to delay its ruling on admissibility. We do not disturb the ruling on the motion in limine.

AFFIRMED IN PART; REVERSED IN PART.