# IN THE COURT OF APPEALS OF IOWA

No. 17-0662
Filed February 6, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KENDU RAY PETTIES,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Robert E. Sosalla,
Judge.


        Kendu Ray Petties appeals from convictions for two counts of murder in the
first degree and one count of conspiracy to commit a forcible felony.  **AFFIRMED.**



        Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant
Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant Attorney
General, for appellee.


        Heard by Potterfield, P.J., Doyle, J. and Danilson, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DANILSON, Senior Judge.**

Kendu Ray Petties appeals following a jury trial from convictions for two counts of murder in the first degree and one count of conspiracy to commit a forcible felony. Petties first contends the trial court abused its discretion in admitting transcripts of cell phone recordings and shoeprint evidence. He also asserts his trial counsel was ineffective in a number of respects. Next, Petties maintains the court erred in denying his motions for judgment of acquittal and for new trial because there is insufficient corroborating accomplice testimony to support the jury's verdicts and the verdicts are contrary to the weight of the evidence. Finally, he argues the court failed to determine Petties had the reasonable ability to pay court costs.

We find no abuse of discretion in the court admitting the transcripts of the cell phone recordings where the recordings themselves were also admitted. Nor did the court abuse its discretion in allowing the shoeprint evidence because the shoe size of the prints was the size of the defendant's shoe and corroborated Petties's statements that he was in area for quite some time before shooting into the house and officers' testimony about the number of prints noted at the scene. Petties's ineffective-assistance-of-counsel claims fail for lack of prejudice. There was sufficient evidence corroborating accomplice testimony and the verdicts were supported by substantial evidence and were not contrary to the weight of the evidence. Consequently, we affirm the convictions. The record does not support Petties's claim that the court failed to determine his ability to pay court costs.

**I. Background Facts and Proceedings.**

On April 2, 2014, Quintrell Perkins[1] and Sierrah Simmons were shot and killed by gunfire coming from outside the house as they were sitting in the living room of Christopher Perkins's home in Cedar Rapids, Iowa. Sarah Sirlona, Perkins's girlfriend, and Teairra Hawkins were also in the room, as was a child. Sirlona, who was sitting on a couch with Perkins, saw a flash in the side window, heard a "bunch of pops," and saw Simmons bleeding. Simmons stood up, but fell down, blood dripping down her face. Perkins slid off the couch, tried to crawl, and collapsed. Sirlona grabbed the child, ran upstairs with Hawkins, and called 911.

Cedar Rapids police officer Michael Diercks received a dispatch at 10:09 p.m. regarding a shooting involving two victims. Officer Diercks parked near the reported address and smelled gunpowder as he approached the house and checked the perimeter. When Officer Diercks walked in the home, he saw Simmons face down in a pool of blood with a cell phone in her hand; she did not move. Officer Diercks attempted to revive Perkins who was bleeding from the chest. Both victims were pronounced dead at the scene.[2]

Officer Gabriel Hepke also responded to the dispatch and took photographs of the interior and exterior of the house. He cordoned off the area looking for evidence and saw bullet holes on the exterior of the house and shell casings on

---

[1] Several individuals involved have the surname of Perkins. We will use the first names or nicknames of those other than Quintrell.

[2] An autopsy was performed on both Perkins and Simmons. The medical examiner determined that Perkins's cause of death was a gunshot wound to the chest and Simmons's cause of death was a gunshot wound to the head and neck.

the ground. Officer Hepke spoke to witnesses at the scene who reported they did not see the shooter but heard the shots.

Crime Scene Investigator John McDaniel walked around the scene. On the east side of the house, Investigator McDaniel saw several bullet holes in the window and siding. Investigator McDaniel counted eleven bullet holes—one in the window frame, five in the window, and five on the siding to the right of the window. He found eleven shell casings. Four were Winchester brand and seven were Remington Peter brand. Officers determined the casings had been fired from the same weapon.

After the officers obtained a search warrant for the home, they photographed and video recorded the interior of the house and conducted bullet trajectory analyses with rods and lasers. Investigator McDaniel believed the shots were fired from a grassy area to the east of the residence. Crime Scene Investigator Ron Johnson video-recorded the scene and documented the shell casings. Two of the shell casings and two bullets were recovered from inside the residence. Investigator Johnson saw shoe prints in the area where the shell casings were found. The prints were in soft dirt conducive to a casting, and he made two castings, only one of which proved suitable for comparison. The distinctive shoe patterns were from a Nike Air Force 1.™

Division of Criminal Investigation criminalist Vic Murillo conducted the firearms examination. He determined the two bullets and two casings recovered from inside the home were Winchester .40 caliber ammunition fired from the same weapon—probably a Glock .40 caliber semi-automatic pistol. A Glock would be

the only semiautomatic pistol that could fire both types of shell casings the police recovered from the scene.

On April 15, 2014, Bruce ("BJ") Williams contacted one of the lead investigators in the double homicide, Investigator Chip Joecken. Williams told Investigator Joecken that some time before the April 2 shooting, Kendan ("Fudd") Fonville and Joseph ("Little Joe") Perkins assaulted Williams outside a beauty store while he waited for Ashley Pennington. Williams denied any involvement in the shooting. However, his cell phone records indicated he sent a text message to Jade Hasson[3] the day before the shooting to the effect that he was going to kill Fudd and Little Joe.[4] Williams's phone records also placed his cell phone on the southeast side of Cedar Rapids on April 2—not in Marion, where Williams claimed to be.

Pennington was in a relationship with Williams at the time of the shooting. The officers believed Pennington drove Williams to the area of the crime in a white Impala and suspected Williams had been the shooter. Police interviewed Pennington twice in 2014, but she was uncooperative.

Though investigators believed Pennington drove Williams to the scene of the killings and that it was Williams who was the shooter, the investigation stalled. Then, in April 2015, Davonte Barnes contacted Iowa police stating he had information about the April 2014 Cedar Rapids murders and had three video recordings on his cell phone related to the shooting. Barnes stated that on the

---

[3] Hasson was the mother of Williams's child.

[4] According to cross-examination, Williams sent text messages: "I just want to tell you I love you so much before I go to jail." And also, "Fudd and Little Joe just jumped on me, and I'm going to kill them right now."

night of April 2, 2014, Petties (who he knew as "K-9") contacted him. Petties told Barnes that Fudd and Little Joe were at the home of CP, Perkins's father. Petties and Barnes both had histories with Fudd and Little Joe, and Petties asked Barnes to go with him to kill them. Barnes declined. Barnes said he saw Petties the next morning when he picked Petties up at an apartment in Marion, Iowa, near the post office. Petties told Barnes that Williams and Pennington had picked him up the night before and drove to CP's house. Petties said he waited outside the Perkins house for thirty to forty-five minutes, heard talking, saw "dreads," and started shooting through the window. Petties believed he saw and shot at Little Joe. According to Barnes, Petties shot a .40 Glock given to him by a common acquaintance, Dion Clayborn. The gun had a red beam and an opening on the top. Petties claimed to have emptied the magazine and thought he killed Fudd.

Barnes told police he came in contact with Petties again on a bus to Chicago in February 2015. At that time, Barnes was "on the run" from a halfway house in Minnesota. Barnes stated he had known Petties for several years. He knew Petties was enemies with Fudd and Little Joe and that Petties had wanted to kill Fudd and Little Joe because they jumped his "baby mama's" brother, "BJ" Williams. Barnes and Petties spent the next week together in Chicago. While there, Barnes recorded Petties talking about the April 2014 shooting. In one recording, Petties referenced Pennington[5] taking and passing a lie detector test. Petties also stated that he "coulda smoked the bitch" when he was at the Hy-Vee on Mount Vernon Road.

---

[5] Here, Petties referred to Pennington as "the bitch."

In another recording, Petties talked about the shooting and said he waited in the back yard for thirty to forty-five minutes before the police arrived on the scene. He admitted to Barnes he had shot the wrong person.

In the final recording, Petties said that a person does not shoot and run because it looks too obvious. He described a "black bitch" with a hole in it, which Barnes interpreted to mean the gun Petties used. Petties made several shooting noises heard on the recording and said he "pulled that bitch out for real . . . that light came on." Petties described a "red dot" on the weapon.

After speaking with Barnes, police then interviewed Pennington and Williams again. In an August 2015 statement, Pennington said she did not know the shooter's name but that he was the "baby daddy" of Williams's sister. She also said that she drove the shooter and Williams to the 1700 block of Bever Avenue South East in Cedar Rapids. Petties then directed her to an alley nearby. Pennington parked the car in an alley between Bever and 4th Avenue. When she pulled in, a black Chrysler pulled in behind her and blocked the alley. After she parked, Petties got out of the car, walked over to the Chrysler, and then walked down the alley. She heard "close" gunfire and tried to leave but Williams told her to stay. She waited until Petties walked "nonchalantly" and got back in the car. At that point, she realized Petties had a gun. Petties handed the gun to Williams and Pennington noticed that the top of the gun was open. She thought she dropped Petties off where she picked him up. Williams told her to keep quiet about the incident and Pennington agreed. Pennington expressed concern for her safety and that of her family members.

For his part, Williams eventually told police he and Pennington were driving around Cedar Rapids and met up with Petties at a gas station on 1st Avenue for the purpose of finding Fudd and Little Joe. Williams stated Petties had been dropped off at the gas station by a black car. Petties got into the white Impala and told Pennington to drive past a house on the 4th Avenue SE block of Bever. Petties told them Fudd was at the house and he was going to retaliate against him. Pennington parked the car in an alley. Petties asked Williams to go with him, but Williams said "no."[6] Petties got out of the car and walked down an alley. He was gone for twenty to thirty minutes. Williams heard multiple gunshots and saw Petties come out of the alley. Petties told Williams he "fired it up" and "emptied this mother fucker." Williams stated Petties held an automatic pistol in his hand that had a red beam/light under the barrel and the ammunition clip was empty. Petties called Williams a "pussy" for not shooting. He also told Williams and Pennington to be quiet and not talk to anyone, reminding Williams that they were family. Like Pennington, Williams expressed concern for his safety after the interview.

Police found Petties in the Phoenix area and Detective Greg Aboud and Investigator Joecken went to Phoenix to interview him. Petties waived extradition and was charged with conspiracy to commit a forcible felony and two counts of murder in the first degree.

At trial, Sirlona testified that on April 2, 2014, she and Perkins (she called him "Terrell") were at the house on Fourth Street to baby-sit "[C]P's wife's two

---

[6] Williams testified, "I was originally supposed to be one to go shoot, but I didn't. And then he got out and shot the house up and came back, we left."

younger children." Fudd and Little Joe had come to the house earlier in the day to talk with Perkins, but they were told they could not be in the house while CP was gone so they waited outside for a ride. About two hours after Fudd and Little Joe left, Sirlona and Perkins left for a time. It was dark when they returned. Sirlona stated the shooting occurred about fifteen minutes after their return as she, Perkins, Simmons, Hawkins, and one of the two children they were baby-sitting were in the living room. Sirlona and Perkins were sitting on one couch, which was facing a second couch on which Hawkins and Simmons were sitting. Perkins and Simmons were nearest the window through which the shots were fired.

Barnes testified he and Petties had "the same enemies," being Fudd and Little Joe. On April 2, 2014, Petties had contacted Barnes while Barnes was at a restaurant with his girlfriend. Petties told Barnes that Fudd and Little Joe were at CP's "crib" and asked Barnes to ride along to "retaliate against them." Barnes testified, "You know shoot with intention to killing them." Barnes testified the reason Petties wanted to retaliate was that Fudd had "jumped" Williams. Barnes also stated Fudd had shot at Barnes "several" times in the past, and Barnes and Petties had previously discussed killing Fudd and Little Joe. Barnes stated he "wasn't feeling it that night" and learned of the double homicide the next morning when Petties called him. Barnes testified he drove to Petties's apartment and picked him up. Barnes stated Petties then

> [t]old me he was waiting on—that BJ [Williams] and Ashley picked him up, took him over there. Said he was waiting on the outside of the house probably thirty, forty-five minutes. Could hear them talking. Looking through the window he seen some dreads, thought it was Little Joe, and he started shooting.

Barnes stated Petties told him he used a .40 caliber Glock he got from Clayborn and that he had "emptied the magazine"; "[h]e said he upped the gun, seen a light—seen a light come on and got to shooting, and just go to go rapidly." Barnes had seen Clayborn with the pistol previously, which had a laser-type beam on the bottom of the barrel and the top of the barrel was open. Petties also told Barnes that Clayborn and his girlfriend were present at the scene in Clayborn's black Chrysler. Barnes testified Petties told him he walked away from the shooting because "when people run away, it's too obvious." When asked if Barnes remembered what pants or footwear Petties was wearing, Barnes testified, "Probably some Air Force Ones that we usually wear."

Barnes also testified about meeting Petties on the bus to Chicago, spending time with him in Chicago, and secretly recording parts of conversations as Petties talked about the Cedar Rapids shootings. The recordings were admitted into evidence without objection.

The State then offered transcripts of the recordings, which Barnes agreed were "fair and accurate depiction[s] of the content of [his] conversation[s] between [him] and Mr. Petties." The defense objected as "not the best evidence of what was actually said on the video." The court overruled the objection stating, "I think sufficient foundation is laid as to that." Barnes identified his and Petties's voices on the recordings and testified as to the conversations. Investigator Joecken testified he transcribed the videos.

Barnes explained that after he and Petties left Chicago, they stayed in Indiana for "couple of months" and then Barnes was arrested at a hotel. Barnes testified he had his cell phone with the recordings when he was arrested and later

transferred to Linn County, Iowa. Barnes gave his cell phone to his attorney to provide the video recordings to the police department "to help" himself.

On cross-examination, Barnes acknowledged he had been arrested in June 2014 and, upon arriving at the jail, he had drafted a request form to speak with officers telling them he had information about a double homicide. Barnes admitted he told an officer he knew who the shooter was but would not pass along the identity until he "had a deal." The officer "blew [him] off." Barnes also acknowledged he spoke with federal drug enforcement investigators later in 2014 and entered into a "proffer agreement"[7] before leaving the Minnesota halfway house and that he made the cell phone video recordings of Petties "hoping to use [the recordings] to better [his] position to get a good deal on the federal charges that could possibly be filed." Barnes also acknowledged Petties owed him $3000 at the time of Barnes's arrest in Indiana. Barnes called Petties when he was extradited to Iowa and asked for that money but Petties did not pay him. Barnes also acknowledged that after providing the videos to police, his report of a probation violation had been dismissed, he had been allowed to return to the halfway house, and he received a deferred judgment on a felony possession charge.

Officers Dierks and Daniel Kent testified about arriving at the scene and attempting to resuscitate Simmons and Williams. After transporting Hawkins to the police station, Officer Dierks was assigned to guard a portion of the crime scene and Officer Kent was assigned to keep the entry and exit log. Officer Kent

---

[7] The defense attorney described a proffer agreement "basically an agreement that you will tell them what you know in the hopes for some leniency in your own situation."

testified that two citizens approached the scene on April 3, caused a disturbance, and one person was arrested. The person arrested was "well-known by law enforcement" and familiar to Officer Kent—Kendan Fonville or Fudd.

Pennington testified she knew Petties because Petties was the father of Williams's sister's child. Pennington testified that Little Joe, in Fudd's presence, had beaten Williams a week or two before the shooting on April 2, 2014. Williams was angry and talked to Petties, who told him "I'm going to take care of this or we're going to take care of this."

Pennington testified further that on April 2, she was driving a white Chevy Impala with Williams in the car when they picked up Petties (whom she knew as K-9) from an apartment behind a Hardees on 32nd Street. They then drove to an alley near Bever Avenue and 4th Avenue SE where a black car pulled in behind them, blocking the alley. Pennington testified Petties walked back to the black car and then walked down the alley. After some minutes, she heard gunfire "really close" and she tried to put the car in reverse and leave. She testified Williams then "got mad at me and smacked me and told me to get my foot off the brake, put the car back in drive or—put the car back in park and wait. That I wasn't leaving until [Petties] got back in the car."[8] She stated Petties came back to the car walking "nonchalantly like nothing happened, and he got back in the car, and said 'Okay, we can go.'" As she drove away, she heard Petties say "it jammed" or "it's empty"

---

[8] Pennington also testified her relationship with Williams "was kind of like speak when spoken to, don't ask questions you don't need to know answers to, don't ask me how I got this, don't ask me what I'm doing here, just sit back and be quiet."

and then he handed a semi-automatic, open-topped pistol to Williams. She testified:

> I was scared. I mean anybody could have figured it out after you hear shots and somebody gets back in your car with a gun that obviously they're the one that just shot. So as I said, I didn't want to ask no questions. I didn't want to say anything out of place. I just wanted to get me, myself away from the scene, away from the whole situation. Really, I just wanted both of them out of my car and to just pretend like I knew nothing.

Pennington testified she acted as if she did not know anything "for the first two years." Pennington stated she did not know Petties's given name until three days before trial, knowing him only as K-9, nor did she know Barnes.

During Pennington's testimony, the following exchange occurred:

> Q. So all these things that—that [Williams] did to you: the physical abuse, the lying, the cheating. We've talked about some threats being made here. Up to this point you're still feeling this way. You're right here in court. You're under oath. Why don't you just tell us right now that [Williams] did this? A. Because he didn't.

Criminalist Murillo testified that a ported barrel, a gun that is open at the top, would cause a significant muzzle flash like the light flash Sirlona described at the time of the shooting. He also described the slide on a Glock .40 ends up in a backwards position after all the bullets are fired from it.

Officer Johnson testified about documenting evidence at the scene of the shooting. While officers determined the shooter fired the shots nearer to the house standing in a grassy area, Officer Johnson testified he observed shoe prints proceeding along the garage associated with the house. He noted a shell casing near one shoe print. He also testified he observed a number of Nike Air Force 1 shoe prints on the east side and in the back of the house, which all appeared to be

of the same size "going all different directions."[9]  He testified he made castings of the shoe prints, which appeared to be fresh.  He stated the only other shoe prints he saw in the dirt in that area "appeared to be officer's boot prints."  Officer Johnson testified there was a "tiptoe" shoe print by the window.  He stated the casting he made of the left shoe was the best for comparison and was consistent with that of a size 9 Nike Air Force 1 shoe print; Williams wore a size 11-1/2 shoe, and Petties was wearing a size 9 Shoes for Crews brand shoe while in custody.

Petties was found guilty of all charges.  He now appeals, raising challenges to the admission of certain evidence, ineffective assistance of counsel, the sufficiency of the evidence corroborating accomplice testimony, and the legality of the restitution order.

## II. Scope and Standard of Review.

We generally review evidentiary rulings for an abuse of discretion.  *State v. Olutunde*, 878 N.W.2d 264, 266 (Iowa 2016); *State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014).  We review constitutional claims, such as ineffective assistance of counsel, de novo.  *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).  Challenges to the sufficiency of evidence to corroborate an accomplice's testimony are reviewed for errors at law.  *State v. Taylor*, 557 N.W.2d 523, 525 (Iowa 1996).  Our review of sufficiency-of-the-evidence claims is for correction of errors at law.  *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018).

---

[9] With reference to exhibit 35E, Officer Johnson testified:
> More of the shoe patterns.  The Nike Air here.  Also there.  There's some up here.  Through here.  Going all different directions.  This one going that way.  This one going this way.  Just many different directions, you know, pacing.

**III. Discussion.**

    ***A. Evidentiary complaints.*** Petties argues the district court abused its discretion in admitting the shoeprint evidence and the transcripts of the video recordings. A court abuses its discretion when it makes a decision on unreasonable or untenable grounds or when the decision is based on an erroneous application of law. *See Powers v. State*, 911 N.W.2d 774, 780 (Iowa 2018).

    **1. Shoeprint evidence.** Petties contends there was insufficient foundation to admit the shoeprint evidence. He argues, "[I]t was necessary that the State establish similarities existed between the distinctive characteristics exhibited by the defendant and the characteristics exhibited by the maker of the crime scene shoe prints." Petties asserts there is no testimony as to when the shoeprints were left at the scene and no showing who made the shoeprints or even that he ever wore the type of shoe making such a print.

    The trial court ruled:

> It's a close call. My principle concern from the beginning about this evidence was how strong the testimony would be as to the length of time that those prints could have been in that area. The fact that the prints are there is relevant. But it's also relevant when the prints were made. And to the extent that that can't be determined, it weighs against their admissibility. In viewing them though and viewing them on the video and in viewing them in the photographs, they appear to be fresh enough that I think a reasonable jury and it's reasonable to conclude that they were made somewhere close to the time of the event itself and close enough that obviously that the police took castings of them and felt that they could be pertinent to the—their investigation. The evidence as it relates to the size corresponds to [Petties]'s shoe size. The fact that there may be variance in the different sizings in the manufacturing of the shoes would go to the weight of the evidence. What it all comes down to is considering everything, including the tie-in with Mr. Barnes's testimony. Although I find it concerning that his testimony is somewhat nebulous in terms of placing Air Force One shoes on Mr. Petties's feet when he said they probably—he probably was wearing Air Force One shoes the

day after the event. But he couldn't say because he didn't know. He didn't notice. That's concerning as well that we can't tie it to the Air Force One shoes more directly to Mr. Petties. But the fact that he has a size 9 and that the shoes correspond with a size 9, I think it's admissible and [can] come in. The rest of it does go to the weight. [Petties] will have the full opportunity to challenge the evidence both in cross-examination of the witness and then presentation of their own evidence. So I'm going to permit it.

We find no abuse of discretion in the court's ruling. If the State were relying solely on the shoeprint evidence to prove Petties guilty of the double murder, Petties' arguments might have more weight. *See State v. Mark*, 286 N.W.2d 396, 409 (Iowa 1979) ("In order to establish a proper foundational connection between defendant and the crime scene shoe prints, it was necessary that the State establish that similarities existed between the distinctive characteristics exhibited by defendant and the characteristics exhibited by the maker of the crime scene shoeprints."). But the State is relying on the evidence as corroborative of other evidence placing Petties at the scene. In *State v. Campbell*, 326 N.W.2d 350, 354 (Iowa 1982), the supreme court observed that the "requirements for the admissibility of footprint identification testimony [are] less stringent where there is other evidence connecting the defendant with the crime scene." *See also State v. Oliver*, 341 N.W.2d 744 (Iowa 1983) (finding no abuse of discretion where court allowed shoeprint testimony by criminalist who compared a bloody shoe print on a piece of paper in the victim's apartment with the sole of the defendant's tennis shoe and testified the defendant's shoe could have made the impression on the paper).

In order to satisfy the corroboration rule, evidence need only "tend to connect the accused to the commission of the crime." *See State v. Bugely*, 562 N.W.2d 173, 176-77 (Iowa 1997) ("The existence of a second, small set of

footprints at these burglaries confirms that a second person was involved. These prints, which match those present at [the first] residence, show the same person who committed the [first] burglary was present at the [second] burglar[y].").  In *Bugely*, the defendant's shoes were not found and were not available for comparison to the shoe prints.  *Id.* at 175.  But the shoe evidence was deemed sufficient corroboration of the accomplice's testimony to justify submission to the jury.  *Id.* at 177.

We point out Petties's counsel acknowledged during oral arguments that the officers could testify about what they saw at the scene, including the shoeprints.

We also note that the defense's theory was that Williams was the shooter, not Petties.  The State was relying on the shoeprint evidence to show Williams, who wore a size 11-1/2 shoe, did not make the shoeprints found at the scene.  Here, the shoeprints found at the scene were consistent with a size 9 shoe, which is the same size as the shoes Petties was wearing when arrested.  Clearly, if the size of the shoeprint had been consistent with the shoe size worn by Williams the defense would have urged its admission.

Further, Criminalist Murillo testified that while he could not be certain when the shoeprints at the scene were made they appeared fresh "based on some of the clarity of the pattern."  The prints suggested a person paced about in a small area, which is corroborative of Barnes's testimony that Petties told him he waited by the house for several minutes before seeing who he believed to be Fudd, as well as Pennington's and Williams's testimony that they waited for several minutes before hearing gunshots.  In addition, the shoe store employee testified the Nike

Air Force 1™ shoe was its most popular shoe, and Barnes testified that Petties "[p]robably [was wearing] some Air Force Ones that we usually wear."

We find the district court did not abuse its discretion in allowing the evidence. *See Campbell*, 326 N.W.2d at 354 ("[T]he requirements for admissibility of footprint identification testimony have been held to be less stringent where there is other evidence connecting the defendant with the crime scene.") *and cases cited therein.* It was for the jury to determine the weight of the shoeprint evidence. *Bugely*, 562 N.W.2d at 176.

**2. Transcripts of video recordings.** Petties contends that the court abused its discretion in admitting transcripts of Barnes's cell phone recordings. He argues the State failed to lay an adequate foundation for the admission of the transcript of the recordings because Barnes "never testified to who prepared the transcript of the recordings or how the transcripts were prepared." We find no abuse of discretion.

In support of his position, Petties relies upon Iowa Rule of Evidence 5.901(a), which provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Before introducing the cell phone recordings containing Petties's statements to Barnes, Barnes testified he had reviewed each of them and each was a fair and accurate depiction of the portion of the conversation. This is adequate to allow admission of the video recordings as Barnes was present during the conversations and made the recordings. *See State v. Russell*, 261 N.W.2d 490, 495 (Iowa 1978) (with respect to sound recordings "[w]hat has been required is that the foundation for the

evidence clearly establish that it is accurate and trustworthy"); *see also State v. Klindt*, 389 N.W.2d 670, 674 (Iowa 1986) (applying the *Russell* test), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001).

When the State sought to admit transcripts of the video recordings, Petties objected to the admission of the as not "the best evidence." Counsel argued,

> The video is itself [available], and the jury has been able to hear the video, and, therefore, must be able to make determinations on their own as to what they believe was said as opposed to someone else making their own interpretations. So for that—on that basis I would object.

The trial court allowed the transcripts, concluding "sufficient foundation is laid."

The circumstances here are similar to those in *State v. Allen*, 565 N.W.2d 333, 339 (Iowa 1997). As in the instant case, defense counsel for Allen argued a transcript of a relaxation tape given by the defendant to the victim did not qualify as the best evidence.[10] The supreme court rejected the challenge to the admission of the transcript:

> There was no objection to the admission of the audiotape itself; the jury had both the tape and the transcript to review, minimizing any possibility of unfairness. [The victim's] husband, who had made the copy of the tape, testified that he had compared the transcript with the tape and found the transcript to be accurate. Allen did not object at trial to the manner in which the transcript was made. In addition, he had ample opportunity at trial to offer his explanation as to the words "Sherry" and "cheri," and the jury had the opportunity to assess the significance of the tone and inaudible portions of the tape.

---

[10] The *Allen* case address the question under Iowa Rule of Evidence 5.1003, which addresses the "best evidence" rule: "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."

Here, the jury had both the video recordings and the transcripts. Investigator Joecken testified he transcribed the videos and prepared the transcripts. The jury could compare the recordings with the transcripts and make its own determination as to the transcripts' accuracy. We find no abuse of discretion in the district court admitting them. In any event, Petties does not contend he has suffered prejudice by the admission of the transcripts, which were cumulative to the video recordings. *See State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014) ("Even if a trial court has abused its discretion [in an evidentiary ruling], prejudice must be shown before we will reverse."). Where evidence was merely cumulative of other properly admitted evidence, a defendant cannot establish the court's erroneous evidentiary error affected substantive rights. *State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011).

**B. Ineffective assistance of counsel.** Petties alleges his trial counsel was ineffective (1) in failing to object to the admission of the video recordings prepared by Barnes, (2) in failing to object to the testimony by Investigator Joecken, which he asserts vouched for Barnes's credibility; and (3) in failing to object to prosecutorial misconduct during closing arguments.

The principles of ineffective assistance of counsel have been addressed often by our courts and requires the claimant to prove both constitutionally deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008).

*1. Video recordings.* With respect to Petties's complaints about the video recordings,[11] we have already stated there was adequate foundation provided by Barnes's testimony that the recordings provided a fair and accurate depiction of the portion of the conversation he had with Petties. *See State v. Weatherly*, 519 N.W.2d 826, 827 (Iowa 1994). Petties's objections address the weight the evidence should carry—about which his trial counsel cross-examined and argued vigorously—but the weight to be given the evidence was for the jury to determine. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive."). We decline to find counsel ineffective with respect to the video recording evidence.

*2. Improper vouching.* Petties next asserts Investigator Joecken's testimony impliedly vouched for Barnes's credibility and trial counsel was ineffective in failing to object to it. Relying on a number of recent cases concerning whether an expert witness improperly vouched for the verity of a witness's testimony,[12] he challenges the following testimony by Investigator Joecken's regarding Barnes:

---

[11] Petties advances a number of complaints about Barnes's recordings, including Barnes's admitted motive to seek favorable treatment from prosecutors, the fact that the recordings were made of only selective portions of Barnes's conversation with Petties, and insufficient guaranties that the recordings had not been tampered with.

[12] *See State v. Dudley*, 856 N.W.2d 668, 676-77 (Iowa 2014) (noting the "well-settled Iowa law prohibiting an expert witness from commenting on the credibility of a victim in a criminal sex abuse proceeding"); *State v. Brown*, 856 N.W.2d 685, 688-89 (Iowa 2014) (stating that the *Dudley* decision "establishe[s] the legal principles applicable to the situation when an expert witness's testimony crosses the line and directly or indirectly vouches for a witness's credibility thereby commenting on a defendant's guilt or innocence"); *State v. Jaquez*, 856 N.W.2d 663, 665-66 (Iowa 2014) (also dealing with child sex abuse complainant).

[PROSECUTOR]: In retrospect knowing what you know now, do you believe there are some matters that [Barnes] provided you [in June 2014 interview] that were consistent with what turned up in the investigation and what he told you at a later date. [JOECKEN] Yes.

The prosecutor then asked about the subsequent investigation:

Q. For instance, did [Barnes] indicate to you that the shooter in this double homicide used a .40 caliber gun? A. Yes.

Q. Did he indicate to you that the shooter had called him, that's Mr. Barnes, to go with him? A. Yes.

Q. Did he tell you that he declined to go? A. Yes.

Q. Did he tell you that there were two cars involved and that one of them contained BJ? A. Yes.

Q. Did he tell you that the driver of the other car was a person by the name of Dion? A. Yes. Q.

Q. When discussing the firearm used, did he mention that it had a red dot sight or a laser sight? A. Yes, he did.

Q. Did he tell you that the shooter had looked through the window and shot through the window? A. Yes.

Q. Did he tell you that the shooter thought that he saw Fudd, that's why he shot? A. Yes.

Q. Did he tell you that as a result of that an innocent bystander was killed? A. Yes.

Q. Did he tell you that—that "he," this being Barnes, was 100 percent sure that he was home and did not assist in this murder? A. Yes.

Q. Did he tell you that the information he had was that Fudd had just left the house sometime before the murder occurred but came back later? A. Yes.

Q. Did he tell you that Dion, the person Dion involved in this, was driving a black Chrysler 200? A. Yes.

Q. Did he tell you that the information he had was that BJ and the shooter were related? A. Yes.

Q. Did he tell you that he talked to the shooter the next morning and after picking him up in Marion? A. Yes.

Q. Did he tell you that the shooter indicated he emptied the clip? A. Yes, he did.

Q. Now, you've spoken to Mr. Barnes, obviously, in this investigation since that day; right? A. Yes.

Q. Are these details that he told you on June 4th that you know now were consistent with what he told you later? A. Yes.

Q. And are these details that have been developed and through the course of this investigation? A. Yes.

Expert witnesses may not opine as to a witness's truthfulness. *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986). The purpose of this type of examination, if not vouching, attempts to invade the jury's duty to determine what evidence is reasonable and consistent and should be avoided. The effort to show the jury the evidence is reasonable and consistent is best left for closing arguments. Notwithstanding, even if we were to conclude Investigator Joecken's testimony crossed the line and can be characterized as vouching for Barnes's credibility or otherwise invaded the province of the jury, we find the ineffectiveness claim fails on the prejudice prong. In light of the evidence of Petties's guilt, i.e., Barnes's video and testimony, the testimony of Pennington and Williams, Petties's motive, and the shoeprints, as well as clear evidence the victims were killed by gunshots with the shooter standing outside the house near the window, we cannot conclude the outcome of the trial would have been different had counsel objected. *See State v. Madsen*, 811 N.W.2d 714, 727 (Iowa 2012) ("Prejudice exists if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (citation omitted)).

**3. Prosecutorial misconduct.** Petties next challenges the prosecutor's comments in closing argument as also improperly vouching for the credibility of witnesses, and he faults his trial counsel for failing to object. We are not persuaded that the prosecutor's statements about the investigation being "a search for the truth" and comments about the motives of Pennington and Williams constituted improper vouching. Moreover, Petties has not established the result of the trial would have been different had counsel objected. The trial court could

find that the prosecutor's statements were a fair response to the defense closing argument.

**C. Sufficiency of corroborating evidence.** Lastly, Petties asserts there is insufficient corroboration of the testimony of Pennington, Williams, and Barnes to sustain the convictions. Petties asserts he did not admit to police that he was involved in the April 2, 2014 shooting, the gun was never found in this matter, no independent eyewitness placed Petties at the scene, and there was no independent corroborating evidence that Petties was in Cedar Rapids at the time except for the statements from Williams, Pennington and Barnes.

> An accomplice is a person who "'could be charged with and convicted of the specific offense for which an accused is on trial.'" *State v. Berney*, 378 N.W.2d 915, 917 (Iowa 1985) (citation omitted). Thus, proof that the person had knowledge that a crime was planned or proof that the person was present when the crime was committed is insufficient standing alone to make the person an accomplice. *Id.* It must be established by a preponderance of the evidence that the person was involved in some way in the commission of the crime. *Id.*

*State v. Douglas*, 675 N.W.2d 567, 571 (Iowa 2004).

Petties did not assert Barnes was an accomplice at trial, and he cannot do so now. In any event, Barnes does not fall within the ambit of an accomplice. While there is evidence he was aware Petties intended to look for revenge upon Fudd, proof of this knowledge is not sufficient standing alone to make him an accomplice. *See id.*

Iowa Rule of Criminal Procedure 2.21(3):

> A conviction cannot be had upon the testimony of an accomplice . . . , unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"The existence of corroborating evidence is a legal question for the court." *Bugely*, 562 N.W.2d at 176. Once the legal adequacy of the corroborating evidence is established, the question of the sufficiency of the evidence is for the jury to determine. *Id.*

Corroborating evidence may be either direct or circumstantial; it need not be "strong" proof of guilt, so long as it backs a material aspect of the accomplice's testimony and tends to link the accused with the commission of the offense. *State v. Yeo*, 659 N.W.2d 544, 548 (Iowa 2003). This rule of accomplice corroboration serves two purposes: "(1) to independently connect the defendant to the crime; and (2) to counterbalance the dubious credibility of a witness whose testimony may be motivated by self-interest in casting the blame elsewhere." *Taylor*, 557 N.W.2d at 527-28.

"Any corroborative evidence which tends to connect the accused with the commission of the crime and thereby supports the credibility of the accomplice is sufficient." *State v. Vesey*, 241 N.W.2d 888, 890 (Iowa 1976). The corroboration rule "is met if it can fairly be said the accomplice is corroborated in some material fact tending to connect the defendant with the commission of the crime." *Id.*

Based on the evidence, we conclude there was substantial evidence in addition to accomplice testimony tending to connect Petties with the commission of the shooting. Petties's statements to Barnes connect Petties to the shooting. *See Douglas*, 675 N.W.2d at 572 (reaffirming that "a defendant's out-of-court confessions and admissions may corroborate the testimony of an accomplice"). Petties told Barnes he was outside the house for several minutes waiting. The

shoeprints in the area indicate someone paced about in the yard. Shell casings were found by the shoeprints. Those shoeprints were distinct, as were the prints of officers' boots, suggesting the prints were made recently. The two types of ammunition found at the scene were shot from the same gun. A .40 Glock could fire both types of ammunition. The gun Williams and Pennington described Petties carrying back to the vehicle had a laser sight. According to Barnes, Petties used a .40 Glock he obtained from Dion Clayborn. In one of the videos Barnes provided, Petties referred to the red light coming and then he started shooting. Accordingly, the district court did not err in finding sufficient corroborative evidence to submit the case to the jury.

*D. Court costs.* Petties also contends the district court erred in failing to determine whether he had the "reasonable ability to pay" court costs. This record belies the claim.

At sentencing, the district court imposed, but suspended, the $1000 fine for conspiracy and ordered Petties to pay court costs on the two murder convictions and pay restitution of $150,000 to each of the victim's estates. But, "given the defendant's ongoing status of incarceration," the court found Petties "is indigent and lacks sufficient resources to reimburse attorney fees; and therefore, I assess no attorney fees against the defendant."

> To the extent a defendant is "reasonably able" to do so, he is to pay restitution for court costs and attorney fees. Iowa Code § 910.2. A court's assessment of a defendant's reasonable ability to pay is a constitutional prerequisite for a criminal restitution order. *See State v. Van Hoff,* 415 N.W.2d 647, 648 (Iowa 1987); *State v. Haines,* 360 N.W.2d 791, 797 (Iowa 1985). The focus is not on whether a defendant has the ability to pay the entire amount of restitution due but on his ability to pay the current installments. *Van Hoff,* 415 N.W.2d at 649.

A defendant bears the burden of proof when challenging a restitution order. *See State v. Storrs,* 351 N.W.2d 520, 522 (Iowa 1984). "[A] defendant who seeks to upset an order for restitution of court costs and attorney fees has the burden to demonstrate a failure of the trial court to exercise discretion or abuse of discretion." *Id.*

*State v. Blank*, 570 N.W.2d 924, 927 (Iowa 1997).

Because the district court did consider Petties's ability to pay, the court did exercise its discretion. Petties does not contend the trial court abused its discretion.

***E. Supplemental brief by Petties.*** Petties has also filed a pro se supplemental brief in which he contends his trial counsel was ineffective for failing to object to various statements made by the prosecutor during opening and closing arguments, which Petties contends are improper and inflammatory.[13] He also claims counsel failed to object to admitting his "involuntary confessions" on the video recordings provided by Barnes.[14] We have reviewed his claims and find them either to be without merit or insufficient to undermine our confidence in the result. Thus, his claims of ineffective assistance fail.

---

[13] Petties acknowledges, however, the jury was given the cautionary instruction that statements made by counsel are not evidence. *See generally State v. Coleman*, 907 N.W.2d 124, 143 (Iowa 2018) (finding ineffectiveness claim based on improper arguments by prosecutor not prejudicial); *Id.* at 154 (Appel, J., concurring in part and dissenting in part).

[14] While Barnes may have encouraged Petties to talk about the matters he recorded, there is no evidence Barnes coerced Petties into making his statements. *See State v. Snethen,* 245 N.W.2d 308, 315 (Iowa 1976) (observing the test is whether a defendant's inculpatory statements "were the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired").

**IV. Conclusion.**

We find no abuse of discretion in the court admitting the transcripts of the cell phone recordings, particularly where the recordings themselves were also admitted.  Nor did the district court abuse its discretion in allowing the shoeprint evidence.  The ineffective-assistance-of-counsel claims fail for lack of prejudice.  We find sufficient evidence corroborating the accomplice testimony, and we conclude the verdicts were supported by substantial evidence and were not contrary to the weight of the evidence.  We, therefore, affirm the convictions.  The court did not err in imposing court costs.

**AFFIRMED.**