2021 IL App (2d) 190868
No. 2-19-0868
Modified opinion filed May 6, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-275 |
| ANNA L. MUELLER, | ) ) | Honorable Joseph P. Bruscato, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    After causing a motor vehicle accident, defendant, Anna L. Mueller, was convicted of two counts of aggravated driving while under the influence of alcohol (625 ILCS 5/11-501(a)(2), (d)(2)(D), (d)(1)(G) (West 2016)) and one count of aggravated driving with an alcohol concentration of 0.08 or more (*id.* § 11-501(a)(1), (d)(2)(D)). On appeal, defendant argues that the trial court erred by admitting the results of two blood alcohol tests that were taken in a hospital emergency room following the accident. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    On October 14, 2016, the State filed a bill of indictment charging defendant with three counts of alcohol-related driving offenses. Count I of the indictment charged defendant with

aggravated driving while under the influence of alcohol (*id.* § 11-501(a)(2), (d)(2)(D), (d)(1)(G)), alleging that defendant drove under the influence of alcohol at a time when defendant had four prior violations of driving under the influence of alcohol. Count II charged defendant with aggravated driving with an alcohol concentration of 0.08 or more (*id.* § 11-501(a)(1), (d)(2)(D)) at a time when defendant had four prior violations of driving under the influence of alcohol. Count III charged defendant with aggravated driving while under the influence of alcohol (*id.* § 11-501(a)(2), (d)(1)(G)), alleging that defendant drove under the influence of alcohol at a time when her driving privileges were revoked for a violation of section 11-501 of the Illinois Vehicle Code or a similar out-of-state offense. On November 16, 2016, defendant was arraigned before the Honorable Philip J. Nicolosi for these offenses and entered a plea of not guilty.

¶ 4    On June 28, 2017, defendant filed a motion to quash her arrest and suppress evidence, seeking to suppress the results of three separate blood alcohol tests from blood draws that all had been taken at Swedish Covenant Hospital (the hospital) following the accident. Regarding the first blood draw (the medical blood draw), defendant suggested that her fourth amendment rights were violated when paramedics—who were acting as State agents—took her to the hospital against her will, where her blood was drawn "for no medical reason but instead to assist police." See U.S. Const., amend IV.

¶ 5    Regarding the second blood draw (the administrative blood draw), defendant argued that her fourth amendment rights were violated when her blood was drawn "without authority and without consent." While defendant acknowledged that she gave a Belvidere police officer, Officer Zapf,[1] her "purported consent" after being read the "Traffic Crash Warning to Motorist" (the faulty

_____

[1] Neither the parties nor any portion of the record seem to provide Officer Zapf's first name.

warning) "pursuant to 625 ILCS 5/11-501.6," she claimed that this consent was invalid because it was predicated on false information.

¶ 6       Finally, regarding the third blood draw that was taken at the hospital (the jail blood draw), defendant argued that there was no medical purpose justifying the draw, that the procurement of the draw was not grounded in statute, and that defendant had not consented to the draw, which was subsequently procured without a warrant.

¶ 7       On October 5, 2017, the State responded to defendant's motion, suggesting that "neither the State, nor any of its agents, played any part" in obtaining the medical blood draw and that the draw was "made in the regular course of providing medical treatment." While defendant argued that she did not consent to the medical blood draw, the State contended that, based on the paramedics' observations, defendant was "not suitable to refuse care." The State next conceded that Officer Zapf read defendant the wrong warning before obtaining her consent to complete the administrative blood draw.[2] However, the State contended that the only available remedy for this error was to lift and rescind defendant's summary suspension and not to suppress the results of the blood test. Furthermore, according to the State, the question of consent was misplaced because "[t]he [a]ppellate [c]ourt held that consent is no longer a requirement for the admission of the results of chemical tests into evidence." Finally, in response to defendant's arguments concerning the legality of the jail blood draw, the State reported that it would not seek to admit that final draw.

---

[2] According to the State, Officer Zapf incorrectly informed defendant that her license could be suspended for either 6 or 12 months for withholding her consent, when the proper suspension period was either 3 or 6 months.

¶ 8    On October 10, 2017, the trial court held a hearing on defendant's motion to suppress. On that date, five witnesses were called to testify: Anita Bowers, Robert Palin, Shane Schultz (Shane), and Lauren Schultz (Lauren) (Lauren is of no relation to Shane).[3]

¶ 9    Bowers testified that she was employed as an emergency room nurse at the hospital. Relying on her previously composed notes to aid in her testimony, Bowers confirmed that she was working on April 21, 2016, when defendant first entered the hospital's emergency room. She first examined defendant at approximately 8:20 p.m. At that time, she learned that defendant was in a vehicular accident. While Bowers assessed defendant, defendant told her that she was drinking wine earlier that day. Bowers noticed that defendant had a "skin tear to the right forearm"; defendant told her that the injury resulted from a fall at home. From her notes, Bowers recalled learning that defendant was reportedly ambulatory at the scene of the accident and that she denied any new pain directly resulting from the accident. Bowers's triage assessment of defendant indicated that defendant was in "no apparent distress" and that she was "uncomfortable, slender, well nourished, [and] well groomed." Bowers also indicated that defendant was "belligerent with slurred speech" and that she was "challenging when asked questions."

¶ 10    Defense counsel began to question Bowers about the other driver involved in the accident—Michael Scarpetta—who also received treatment at the hospital. When the State questioned the relevance of Scarpetta's medical records, defense counsel indicated that his injuries

---

[3] Sheila Sue Tauscher was also called as a witness, but after asking her a few brief questions about her occupation and professional training, defendant indicated that it was not necessary to question Tauscher any further. Because her testimony is therefore irrelevant to the matters at hand, it has been omitted.

were directly relevant to the statutory warning that Officer Zapf read to defendant before obtaining her purported consent for the administrative blood draw. Specifically, defense counsel indicated that the section 11-501.6 warning "only applies in [personal injury] accidents when somebody other than the defendant has a [c]ategory A injury" and that, if Scarpetta did not have such an injury, section 11-501.6 "should not have been dealt with" and was "improperly a mechanism" by which the State obtained consent for the administrative blood draw. During this exchange, the State once again acknowledged that Officer Zapf read defendant the incorrect statutory warning prior to the administrative blood draw. Eventually, Bowers testified that Scarpetta experienced pain in his chest and shin following the accident. She further indicated that Scarpetta had "bruising and a hematoma" on his shin and that the airbags in his vehicle were deployed as a result of the accident.

¶ 11     Palin testified that he was a registered nurse employed by the hospital and that he worked an overnight shift in the emergency room beginning on April 21, 2016. Referring to his notes on defendant's medical charts, Palin testified that he had first seen defendant at approximately 8:25 p.m. on April 21, 2016. At that time, defendant showed "no apparent distress" and was "slender, uncomfortable, well nourished, well groomed, *** belligerent, [had] slurred speech," and "was challenging staff when asked repeated questions." Palin noted that defendant was "in no apparent distress" and was reportedly "ambulatory" at the scene of the accident. While defendant was apparently able to walk, her "gait was unsteady." Palin testified that defendant "initially attempted to refuse transport" to the hospital and that she was "awake but confused."

¶ 12    Palin further reported that the administrative blood draw was "obtained at the request of the Illinois State Police" at approximately 9:14 p.m.[4] Palin testified that he personally participated in that blood draw. Upon further questioning, Palin confirmed that the blood draw "was done per the police request."

¶ 13    On cross-examination, the State asked Palin whether his "job [was] to assess the patient for medical needs, [and] not to assist the police in legal proceedings." Palin answered in the affirmative. The State then asked whether "it wasn't until later for the [administrative blood draw] that [Palin] assisted the police." Again, Palin agreed. Palin also testified that, to the best of his recollection, other than the administrative blood draw, no police officer "was telling [him] what to do."

¶ 14    Shane testified that he was an EMT paramedic, employed by OSF Lifeline Ambulance (Lifeline). Referring to a report that he had previously prepared, Shane recalled responding to defendant's car accident on April 21, 2016. He testified that, when he first approached defendant at the scene of the accident, "[i]t was apparent that she was unsteady." According to Shane, defendant was not bleeding and was standing and walking at the scene of the accident. He did not observe any life-threatening injuries on defendant's person.

¶ 15    Shane testified that defendant did not ask to go to the hospital or "attempt to refuse treatment." Nevertheless, based on her behavior and mannerisms, Shane determined that she was not suitable to refuse care. Defense counsel asked why Shane "decide[d] that [defendant] was not suitable to refuse care if she wasn't refusing care." Shane replied, "[W]alking her to the ambulance,

_____

[4] Based on the timing of the blood draw, Palin seems to have been referring to the administrative blood draw.

it became apparent—and asking her orientation questions, it became apparent that she was not able to make decisions for herself." To this point, Shane recalled that defendant "was confused about [the] day of the week, [and] was confused about what month [it was]." Defendant "didn't answer [Shane's] questions appropriately." However, Shane found no signs of a head injury—he recalled only the skin tear on defendant's arm.

¶ 16    When Shane attempted to ask defendant more questions about her medical history, she became "rather abrasive after a while" and used an expletive when speaking to Shane, telling him to "f*** off." Shane testified that defendant became very uncooperative when he was about to transport her to the hospital.

¶ 17    When asked about the other car involved in the accident, Shane indicated that he recognized the other driver, Scarpetta, because he was a "Belvidere fireman" whom Shane had "worked with" in the past. Shane later clarified that he was never in any way employed by the Belvidere Fire Department.

¶ 18    On cross-examination, defense counsel asked more questions about Shane's interactions with defendant. He testified that he detected "a heavy scent of alcohol" when speaking with defendant. Despite her earlier combativeness, Shane recalled that defendant had nonetheless agreed to "go to the ambulance" with him. Defendant asked for assistance when getting into the ambulance and when walking into the hospital, because "[s]he could barely stand up on her own." Defendant admitted to Shane that she had been drinking alcohol earlier that day. Upon further questioning, Shane conceded that defendant's behaviors could have also reflected a possible head injury. Shane testified that no police officer or member of the fire department requested that he take defendant to the hospital.

¶ 19    Lauren testified that, on April 21, 2016, she was employed as a full-time paramedic with Lifeline. On that date, Lauren responded to the scene of defendant's car accident and spoke with the occupants of Scarpetta's car. Aside from Scarpetta, Lauren recalled seeing Al Hyser. Lauren recognized both men as Belvidere firefighters. Lauren did not notice any injuries that required the men to be transported to the hospital by ambulance. Both Scarpetta and Hyser refused care by transport.

¶ 20    Following Lauren's testimony, the hearing was continued to December 14, 2017. On that date, Dr. Joseph Lachica testified that he was employed as an emergency room physician at the hospital on April 21, 2016, and that he had tended to defendant after the accident. Relying on his notes that he made on defendant's medical charts, he specified that he noticed only one injury on defendant's body during her initial examination—the skin tear on her arm. Lachica's notes that he made at approximately 8:47 p.m. indicated that defendant's speech was "a little slurred," yet nonetheless "clear." He testified that, according to "the ambulance crew," defendant initially attempted to refuse transport to the hospital.

¶ 21    Defendant questioned Lachica about "any other observations that were made by [him] that indicated that [defendant] needed to be at the ER." Lachica responded, "I mean, *** she was in a car accident." While he acknowledged defendant's lack of any apparent head injuries, he opined that her slurred speech could have been indicative of such an injury. Defense counsel asked whether Lachica had any indication that defendant had consumed alcohol, and Lachica confirmed that defendant had admitted to him that she was drinking prior to the accident. Lachica testified that her "slurred speech" was also consistent with alcohol consumption.

¶ 22    Turning to notations that Lachica made at approximately 9:31 p.m., defense counsel asked, "Now, at that point *** you indicated that you pulled the patient for [the administrative blood

draw], redraw[5] in a few hours?" Lachica agreed, prompting defense counsel to then ask what medical purpose justified the later redraw. Lachica answered that he ordered the redraw to reassess defendant's alcohol level so that the hospital could "safely discharge the patient who would still be intoxicated."

¶ 23    Defense counsel asked, "What was the medical purpose of the [administrative blood draw]?" Lachica answered, "Drawing blood work. *** These tests are done in the setting of a blunt trauma in anticipation that there might be some internal injuries that I cannot see."

¶ 24    On cross-examination, the State asked Lachica whether he ordered defendant's medical blood draw, which was taken at approximately 8:26 p.m. Lachica answered affirmatively. The State then asked whether any officer instructed Lachica to order the medical blood draw, prompting Lachica to respond, "No, no officer told me to do that." Lachica continued, "In general I don't order labs just because someone asks me to do it. I do it because it's necessary." Lachica also specified that his decision to order those tests "went to the care of [defendant]."

¶ 25    Following Lachica's testimony, the State moved for a directed finding, arguing that defendant failed to make a *prima facie* case that her fourth amendment rights were violated by the procurement of any of the blood draws. After hearing the parties' arguments, the court advised the parties that it would take the matter under advisement. On January 16, 2018, the parties once again appeared to clarify certain points. On this date, defendant made the following argument:

> "Well, I think we've established a *prima facie* case that there wasn't a [section 11-501.6 (625 ILCS 5/11-501.6 (West 2016))] blood draw. If the State wants to put the officer on to say that there was probable cause—if they're going to try to go on that basis, that

---

[5] The "redraw" referred to the jail blood draw.

would come after the motion for directed finding. I've established that there wasn't consent. I don't have to establish probable cause. That's their burden."

¶ 26    On January 25, 2018, the court granted the State's motion for a directed finding via written decision. When discussing the admissibility of the medical blood draw, the court found that defendant failed to make a *prima facie* case of a fourth amendment violation. Specifically, the court found that defendant failed to show any evidence supporting a finding that the ambulance personnel or the medical staff at the hospital were agents of the State or acting as an arm of the State. The court rejected defendant's arguments concerning the lack of consent leading up to the medical blood draw, because those arguments relied on case law that pertained to tort cases involving medical batteries—not criminal cases involving the admissibility of evidence. Either way, the court noted that Shane's testimony had established that defendant was nonetheless unsuitable to decline treatment.

¶ 27    The court also found that defendant failed to make a *prima facie* case of a fourth amendment violation with regard to the administrative blood draw. The court recognized that Officer Zapf did read an incorrect warning to defendant prior to obtaining her consent, but it nonetheless found that "[d]efendant has not provided any authority to sustain her argument that an improper warning negates a motorist's consent resulting in the barring of evidence." The court further noted that "no evidence presented by defendant [suggested] that she did not provide her consent to Officer Zapf or that her consent was invalid for purposes of admission of evidence."

¶ 28    On April 9, 2019, the case proceeded to a stipulated bench trial before a different judge, the Honorable Joseph P. Bruscato. Prior to the bench trial, the parties specified that—over defendant's objections—the court would rely on its findings from the adjudication of defendant's motion to suppress. Consequently, it would admit the medical and administrative blood draws'

results into evidence. After reviewing the parties' stipulations, adopting the Honorable Philip J. Nicolosi's previous findings, and noting that the results of the medical blood draw showed an alcohol concentration of 0.374, the court found defendant guilty of all three charges.

¶ 29    The trial court denied defendant's motion for a new trial, and the matter proceeded to sentencing. At sentencing, the court merged all three counts and sentenced defendant to eight years' imprisonment. After the court denied defendant's motion to reconsider the sentence, defendant timely appealed.

## II. ANALYSIS

¶ 30    On appeal, defendant argues that the trial court erred in denying her motion to suppress and by consequently admitting the test results from both the medical and administrative blood draws. Specifically, defendant argues that the trial court incorrectly found that she had not made a *prima facie* case of a fourth amendment violation resulting from either blood draw. In response to defendant's arguments, the State contends that defendant failed to make a *prima facie* case to show that the government violated her fourth amendment protections, because both blood draws[6] were

---

[6] It is necessary to point out that, in its brief, the State has frustratingly confused the medical and administrative blood draws with one another. The brief states, "[T]he People will first discuss the blood draw taken at approximately 8:30 p.m., and refer to it as the administrative blood draw, followed by an analysis of the blood draw taken at approximately 9:14 p.m. and referred to as the medical blood draw." The State explained that it adopted this nomenclature from the trial court's written decision. However, the State's recollection of the trial court's designations is incorrect. The court referred to the first blood draw—which was taken at approximately 8:26 p.m.—as "the medical blood draw," while referring to the second blood draw—which was taken at

carried out by private actors. Additionally, the State argues that defendant "failed to establish a *prima facie* case that her Fourth Amendment rights were violated where the [administrative] blood draw was not only completed by private actors, but also, that she gave her consent for her blood to be drawn." Lastly, the State argues that, even if the tests' results were erroneously admitted, any inclusion of the results resulted in harmless error. We address these arguments in turn.

¶ 31 "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22. In order to carry that burden, a defendant must make a *prima facie* case that the evidence at issue was obtained by or through an illegal search or seizure. *Id.* "If a defendant makes a *prima facie* case, the State has the burden of going forward with evidence to counter the defendant's *prima facie* case." *People v. Gipson*, 203 Ill. 2d 298, 307 (2003). The ultimate burden of proof remains with the defendant. *Id.*

¶ 32 However, various Illinois courts have been inconsistent in determining what standard of review applies in situations where a suppression ruling is based on the trial court's adjudication of a motion for a directed finding.[7] For instance, in *People v. Relwani*, 2019 IL 123385, ¶ 18 (citing

_____

approximately 9:14 p.m.—as the "administrative blood draw." Otherwise, it would not make sense for the trial court to have discussed defendant's purported consent for the administrative blood draw, if that draw occurred at 8:30 p.m., before Officer Zapf arrived at the hospital. Other provisions of the record similarly confirm that the medical blood draw preceded the administrative blood draw. Therefore, we reject the State's nomenclature in favor of the terms actually utilized by the trial court.

[7] The purpose of a motion for a directed verdict in a trial is to present a question of law as to whether the evidence presented is constitutionally sufficient to sustain a conviction of the crime

*People v. Orth*, 124 Ill. 2d 326, 341 (1988)), our supreme court determined that, in a recission case that was determined via the State's successful motion for a directed finding, " '[t]he trial judge's finding as to the *prima facie* case will not be overturned upon appeal unless against the manifest weight of the evidence.' " There, the court explicitly provided that this standard of review also applies to suppression cases. *Id.*

¶ 33    In *People v. Lomeli*, 2017 IL App (3d) 150815, ¶ 1, the trial court similarly granted the State's motion for a directed finding while hearing the defendant's motion to suppress, prompting appellate review. When determining what standard of review should be utilized in reviewing the trial court's decision, the court found that, while a bifurcated standard of review is normally employed to resolve motions to suppress, "[reviewing courts] review the circuit court's grant of a motion for directed finding during a motion to suppress under the manifest weight of the evidence standard." *Id.* ¶ 10.

¶ 34    In *People v. Green*, 2014 IL App (3d) 120522, ¶ 1 (which the *Lomeli* court cited in its decision), the Third District was once again tasked with reviewing a trial court's decision to grant the State's motion for a directed finding at a defendant's suppression hearing. In determining the appropriate standard of review, the court provided:

---

charged. See *People v. Connolly*, 322 Ill. App. 3d 905, 917-18 (2001). In that setting, we review the evidence in the light most favorable to the State. *Id.* at 918. In the context of a motion to suppress evidence, however, the purpose of a motion for a directed finding is for the trial court to determine whether the defendant has presented a *prima facie* case, thereby shifting the burden to the State to rebut that evidence. *People v. Lomeli*, 2017 IL App (3d) 150815, ¶ 10. Again, as we have provided, the ultimate burden remains on the defendant. *Gipson*, 203 Ill. 2d at 307.

"[W]hen the denial of a motion to quash arrest and suppress evidence is based on the grant of a motion for directed finding, 'the trial court does not view the evidence [in the light] most favorable to the [nonmovant] but, rather, (1) determines whether the [nonmovant] has made out a *prima facie* case, then (2) weighs the evidence, including that which favors the [movant].' [Citations.] The trial court's decision will only be reversed if it is against the manifest weight of the evidence." *Id.* ¶ 28.

¶ 35     Numerous other decisions also support the idea that a trial court's finding of a *prima facie* case should be reviewed according to the manifest-weight standard. In *People v. Heard*, 187 Ill. 2d 36, 54 (1999), our supreme court found that the manifest-weight standard applies to the determination of whether a defendant has made a *prima facie* showing of a *Batson* violation (see *Batson v. Kentucky*, 476 U.S. 79 (1986)). In *Century-National Insurance Co. v. Tracy*, 316 Ill. App. 3d 639, 643 (2000), an insurance case, we also noted that "a trial court's decision [as to the existence of a *prima facie* case] will not be reversed unless it is contrary to the manifest weight of the evidence." In reaching that conclusion, we relied on *Kokinis v. Kotrich¸* 81 Ill. 2d 151, 154 (1980), a case in which our supreme court held that a trial court's decision regarding a directed finding or a verdict "should not be reversed unless it is contrary to the manifest weight of the evidence."

¶ 36     On the other hand, in *In re Estate of McDonald*, 2021 IL App (2d) 191113, ¶ 88, this court recently reached a different conclusion—that when the trial court resolves a motion for a directed finding by determining whether a party has made a *prima facie* case, the trial court's determination should be reviewed *de novo*. We reached the same conclusion in *In re Petition to Certain Territory Commonly Known as the Foxfield Subdivision*, 396 Ill. App. 3d 989, 992 (2009) (citing *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003) (holding that, "[b]ecause a determination that

a plaintiff has failed to present a *prima facie* case is a question of law, the circuit court's ruling is reviewed *de novo* on appeal")).

¶ 37    Despite this split in decisions, we find that we are bound to follow our supreme court's more recent guidance in *Relwani*. As *Relwani* was decided by our supreme court, it constitutes binding precedent. *Agricultural Transportation Ass'n v. Carpentier*, 2 Ill. 2d 19, 27 (1953). Furthermore, because the case invoked language involving suppression cases as well as a directed finding, it is analogous to the matter at hand. We therefore determine that the trial court's findings in this matter will not be overturned unless they are against the manifest weight of the evidence. However, we note that under either this standard or *de novo* review, we ultimately find defendant's arguments to be unavailing.

¶ 38    Under this standard, we find that the trial court properly denied defendant's motion with regard to the medical blood draw because defendant failed to show that the draw was carried out by State actors. Consequently, because the medical blood draw was properly admitted, even if we were to assume that the administrative blood draw was improperly admitted, the trial court's mistake resulted in harmless error.

¶ 39                                    A. The Medical Blood Draw

¶ 40    First, because defendant failed to show that the medical blood draw was performed by State actors, defendant failed to make a *prima facie* case that the draw violated her fourth amendment protections. To make a *prima facie* case for suppression of a blood draw, defendant must show two things: "first, that a search occurred in the form of a blood draw and, second, that the draw violated the fourth amendment." *Brooks*, 2017 IL 121413, ¶ 24. It is indisputable that a blood draw constitutes a search under the fourth amendment. *Id.* ¶ 27. Therefore, to make a *prima facie* case

with regard to the medical blood draw, defendant needed to establish only that the draw violated the fourth amendment. *Id.*

¶ 41     The fourth amendment's "proscription against unreasonable searches and seizures does not apply to searches or seizures conducted by private individuals." *People v. Heflin*, 71 Ill. 2d 525, 539 (1978). A search conducted by a private actor may nonetheless implicate the fourth amendment "when the individual conducting the search can be regarded as acting as an agent or instrument of the State 'in light of all the circumstances of the case.' " *Id.* "Participation by the police in and of itself, then, does not automatically invoke the application of the guarantees against unreasonable government intrusions safeguarded by the fourth and fourteenth amendments." *Id.* at 539-40.

¶ 42     Here, defendant has failed to establish that the hospital or Lifeline, or any of the individuals working for them, acted as State agents when obtaining the medical blood draw. In fact, the record clearly establishes a contrary conclusion. No portion of the record indicates that any police officers were present at the hospital when the medical blood draw was procured. Furthermore, Dr. Lachica testified that the medical blood draw was procured solely for medical purposes and without police encouragement. Nurse Palin seemingly confirmed as much by testifying that the police were only involved with the administrative blood draw. For these reasons, defendant failed to make a *prima facie* case that the draw violated her fourth amendment protections.

¶ 43     Defendant nonetheless argues that section 11-501.4-1 of the Illinois Vehicle Code (625 ILCS 5/11-501.4-1 (West 2016)) "evinces an intent on the part of the State to use its compulsive powers on the private actors in the hospital setting." Accordingly, defendant suggests, when private medical professionals divulge chemical test results to police according to section 11-501.4-1, they become State agents for fourth amendment purposes. Defendant's argument is misguided.

¶ 44 Pursuant to section 11-501.4-1(a):

"Notwithstanding any other provision of law, the results of blood, other bodily substance, or urine tests performed for the purpose of determining the content of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof, in an individual's blood, other bodily substance, or urine conducted upon persons receiving medical treatment in a hospital emergency room for injuries resulting from a motor vehicle accident shall be disclosed to the Department of State Police or local law enforcement agencies of jurisdiction, upon request." *Id.* § 11-501.4-1(a).

¶ 45 Relying on *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989), defendant suggests that section 11-501.4-1's language carries fourth amendment implications. In *Skinner*, the United States Supreme Court analyzed whether certain alcohol and drug tests collected by private railroads triggered fourth amendment protections. *Id.* at 617. There, the tests were conducted pursuant to Federal Railroad Association (FRA) regulations that mandated breath or urine tests from employees who were involved in accidents. *Id.* at 606. The FRA also promulgated regulations that allowed—but did not require—the collection of breath and urine samples from employees who violated certain safety rules. *Id.*

¶ 46 Although the Court recognized that the breath and urine tests were technically carried out by private railroads, which normally fell outside of the fourth amendment's purview, it nonetheless found that both sets of FRA regulations carried fourth amendment implications. *Id.* at 617. Regarding the set of regulations that mandated drug and alcohol testing, the Court found that "[a private] railroad that complies with the *** regulations does so by compulsion of sovereign authority, and [therefore,] the lawfulness of its acts is controlled by the Fourth Amendment." *Id.* at 614. While the permissive testing regulations did not similarly compel the

railroads to test their employees, the Court found that those regulations also triggered fourth amendment protections because "specific features of the [permissive] regulations combine[d] to convince [the Court] that the Government did more than adopt a passive position toward the underlying private conduct." *Id.* at 615. For example, the permissive regulations preempted any other state laws, rules, regulations, or private contracts governing the same subject matter. *Id.* For those reasons, the Court concluded that "[t]he Government has removed all legal barriers to the testing authorized by [the permissive regulations] and indeed has made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions." *Id.* Nonetheless, noting the "the limited discretion exercised by the railroad employers under the regulations, the surpassing safety interests served by toxicological tests in this context, and the diminished expectation of privacy that attaches to information pertaining to the fitness of covered employees," the Court found that the warrantless toxicology tests contemplated by the regulations were reasonable under the fourth amendment. *Id.* at 634.

¶ 47   According to defendant, section 11-501.4-1 is analogous to the various regulations in *Skinner*. Therefore, according to defendant, we should follow the *Skinner* Court's guidance and find that section 11-501.4-1 places private hospitals within the fourth amendment's purview. We disagree.

¶ 48   In bringing her argument, defendant ignores several meaningful distinctions between the regulations in *Skinner* and section 11-501.4-1. In contrast to the *Skinner* regulations, section 11-501.4-1 neither mandates nor authorizes any type of alcohol or blood tests. Instead, section 11-501.4-1 deals only with the disclosure and admissibility of chemical tests that were *already* independently performed by hospitals. 625 ILCS 5/11-501.4-1 (West 2016); *People v. Jung*, 192

Ill. 2d 1, 5 (2000) (holding that section 11-501.4-1 is "strictly confined to the results of physician-ordered blood or urine tests").

¶ 49    Furthermore, because section 11-501.4-1 contains no language removing any legal barriers that hospitals may face prior to testing patients for drugs or alcohol, the statute differs from the *Skinner* regulations because it does not show a "strong preference for testing." Instead, Illinois case law plainly confirms that the purpose of section 11-501.4-1 and its subparts is not to encourage chemical tests but instead to "permit the direct disclosure of blood-alcohol test results by medical personnel to law enforcement agencies" without having to resort to "judicially authorized methods of court discovery." *People v. Ernst*, 311 Ill. App. 3d 672, 676-77 (2000). In order to maintain safe roads in Illinois, the legislature requires anyone who seeks to obtain a driver's license to "consent[ ] to the conditions imposed by the legislature in exchange for that privilege," such as those found in section 11-501.4-1. *Jung*, 192 Ill. 2d at 5.

¶ 50    Simply put, the *Skinner* regulations wholly differ from section 11-501.4-1 in language, scope, and purpose—the only similarity between the provisions is that both the *Skinner* regulations and section 11-501.4-1 have been found to pass constitutional muster. *Skinner*, 489 U.S. at 634; *Jung*, 192 Ill. 2d at 6. Therefore, because the *Skinner* regulations and section 11-501.4-1 are almost completely distinct, *Skinner* is inapplicable to the matter at hand.

¶ 51    Additionally, this court has already implicitly found that section 11-501.4-1 does not automatically trigger fourth amendment protections. In *People v. Wuckert*, 2015 IL App (2d) 150058, ¶ 2, the defendant consented to being taken to the hospital after crashing his car, presumably to avoid hitting a deer. Accounts differed as to whether the defendant was arrested at the scene of the crash. *Id.* ¶¶ 3, 5. While the defendant was at the hospital, a police officer spoke with a nurse about a urine sample the defendant had given during the course of his medical

treatment, which established the presence of intoxicating compounds in his body. *Id.* ¶ 5. The test results were disclosed to the police pursuant to section 11-501.4-1. *Id.* ¶ 22. No evidence suggested that the police officer requested the urine sample to be taken. *Id.* Following the trial court's disposition of the defendant's motion to suppress and a subsequent motion to reconsider, the trial court suppressed the results of the urine test. *Id.* ¶ 1.

¶ 52    We reversed and remanded, holding that section 11-501.4-1 did not convert the defendant's nurse into a State actor:

> "[T]he fourth amendment is not triggered by the actions of private parties unless they act as agents of the State. Therefore, because the test results here were procured by a nurse who was not acting as a State agent (as defendant conceded in the trial court[8]), neither the test *nor the hospital's disclosure of the results to the police, as [section 11-501.4-1] required*, violated defendant's rights." (Emphasis added.) *Id.* ¶ 28.

Otherwise put, we found that section 11-501.4-1 did not in itself trigger fourth amendment protections from what was otherwise a private search. *Id.* In deciding *Wuckert*, we also noted that "foreign authority overwhelmingly holds that the fourth amendment is not implicated when medical personnel perform chemical tests on alleged DUI offenders *and, per statutory requirements, divulge the results to the police or prosecutors.*" (Emphasis added.) *Id.* ¶ 30.

¶ 53    Here, just like the urine test in *Wuckert*, the medical blood draw was taken at a private hospital following a car accident. Both tests were performed by medical staff, for medical reasons, and without any suggestion by police. Section 11-501.4-1 allowed both respective hospitals to

_____

    [8] Although defendant has not made a similar admission before the trial court, *Wuckert*'s analysis and holding was not predicated on the defendant's concession.

disclose both tests to police. Therefore, given the similarities between the medical blood draw and the urine test in *Wuckert*, we apply our reasoning in *Wuckert* to the case at hand and determine that section 11-501.4-1 did not convert any medical staff into State agents.[9] Because defendant has therefore failed to show that the medical blood draw was procured by State action, she has failed to make a *prima facie* case that the draw violated her fourth amendment protections.

¶ 54                                    B. The Administrative Blood Draw

¶ 55    Next, even if we were to assume—solely for the sake of argument—that the trial court erred in denying defendant's motion as it pertained to the administrative blood draw, any faulty admission of that draw could result only in harmless error. "The admission of illegally obtained

---

[9] Because *Wuckert* directly contradicts defendant's arguments and was not cited in her brief, we are compelled to remind defendant that the Illinois Rules of Professional Conduct of 2010 (the rules) prohibit attorneys from knowingly "fail[ing] to disclose *** legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." Ill. R. Prof'l Conduct (2010) R. 3.3(a)(2) (eff. Jan. 1, 2010). During oral arguments, defense counsel conceded his knowledge of *Wuckert* while arguing that the case was inapplicable to the instant matter. We are therefore troubled that defendant failed to follow Rule 3.3(a)(2), which carries the full force of law. *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995) (holding that our supreme court's rules are not merely suggestions). Perhaps even worse, defendant's blatant disregard of the rules prejudiced the State, as the State was unable to prepare for defendant's arguments concerning *Wuckert* prior to oral arguments. For these reasons, we offer defense counsel a stern warning to ensure compliance with the rules in the future.

evidence in a criminal trial following the erroneous denial of a motion to suppress is subject to the harmless error rule." *People v. Hobson*, 169 Ill. App. 3d 485, 493 (1988).

¶ 56 Where a trial court has committed such an error, the State must show that the error was harmless beyond a reasonable doubt. *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005); *People v. Swaggirt*, 282 Ill. App. 3d 692, 705 (1996). Otherwise put, the inquiry is whether the defendant's conviction would stand regardless of the error. *People v. Mullins*, 242 Ill. 2d 1, 23 (2011) (citing *People v. Dean*, 175 Ill. 2d 244, 259 (1997)). In determining whether an error was harmless, courts may consider whether other properly admitted evidence supported a conviction or whether improperly admitted evidence was merely cumulative or duplicated properly admitted evidence. *People v. Becker*, 239 Ill. 2d 215, 240 (2010).

¶ 57 Here, even if the administrative blood draw was improperly admitted, the results from that draw were cumulative to the results from the medical blood draw, which were properly admitted. Because the medical blood draw test already established that defendant's blood-alcohol concentration was well above the legal limit, the results of that test alone conclusively proved that defendant drove with an alcohol concentration of 0.08 or more.

¶ 58 Aside from the medical blood draw, other evidence also supported defendant's convictions. Defendant admitted to Bowers, Shane, and. Lachica that she had been drinking prior to the accident. All these witnesses and Palin testified that, following the accident, defendant was belligerent and exhibited slurred speech. Palin and Shane also noted that defendant was having difficulty walking or that she could barely stand. Shane testified that, while speaking with her, defendant was unable to recall either what day or what month it was. While defendant's difficulty walking, slurred speech, and erratic behavior prompted the hospital to treat defendant in order to rule out any head injuries, these symptoms are also evidence of defendant's intoxication.

Additionally, multiple witnesses reported smelling alcohol when interacting with defendant. All of this evidence, in conjunction with the properly admitted medical blood draw test results, affirmatively proved defendant's guilt of all three counts beyond a reasonable doubt. Therefore, even if the trial court erred in admitting the administrative blood draw test results, such a mistake resulted only in harmless error.

¶ 59                            III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 61    Affirmed.

---

**No. 2-19-0868**

---

| | |
|---|---|
| **Cite as:** | *People v. Mueller*, 2021 IL App (2d) 190868 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Boone County, No. 16-CF-275; the Hon. Joseph P. Bruscato, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and James K. Leven, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, Edward R. Psenicka, and Leslie Martin, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---